Doemel, Respondent, vs. Jantz, Appellant.

*February 10—April 3, 1923.*

*Navigable waters: Rights of riparian owner: Nature and extent: Rights of public: Area between high and low-water marks: Trespass.*

1. The rights of a riparian owner are based upon his title to the ownership of the banks or uplands, and such ownership gives him exclusive privileges of the shore for the purposes of access to his land and the water.
2. These privileges are valuable and are incident to his title to the land, of which he cannot be deprived for any private use, and which the public can acquire from him only by purchase, prescription, or by the exercise of the power of eminent domain.
3. Such rights include the right of using the shore for the purposes of building piers, wharves, harbors, or booms in aid of navigation, and of building walls or other protection so as to prevent loss by erosion.
4. The riparian owner obtains the right and title to the soil formed by accretions and relictions.

5. Title to the soil under the water in inland navigable meandered lakes is held by the state in trust for the benefit of the public for navigation purposes and its various incidents.

6. So far as the structures erected by the riparian owner into the water interfere with the public rights of navigation and its incidents, he takes and holds such rights subject to the public rights.

7. When the waters in the lake recede to low-water mark, the public has the privilege to use the water up to the water line, and when they extend to the ordinary high-water mark such rights in the public are extended accordingly.

8. The public has no lawful right to enter and travel upon that portion of the shore of an inland navigable meandered lake lying between the ordinary high and low-water marks; and upon such an entry the riparian owner may maintain an action of trespass.

APPEAL from an order of the county court of Winnebago county: FRED BEGLINGER, Judge. *Affirmed.*

This is an appeal by the defendant from an order sustaining plaintiff's demurrer to defendant's answer.

Plaintiff alleges in his complaint that he is the owner of lot 5, in section 7, town 18, range 17, in Winnebago county; that said land abuts on Lake Winnebago, and has for many years been used for pasturage purposes. It is further alleged that the defendant trespassed upon these lands, to the plaintiff's damage, etc.

The defendant in his answer alleges that he entered and traveled upon that portion of the shore lying between the ordinary high and low-water marks of said lake; that said lake is a public navigable lake in this state, and that the defendant had a lawful right to enter and travel upon such strip of land without being guilty of a trespass or of violating any of plaintiff's rights in the premises. To the defendant's answer plaintiff interposed a general demurrer upon the ground that the answer did not state facts sufficient to constitute a defense. The trial court sustained the demurrer, and defendant has appealed from such ruling.

For the appellant the cause was submitted on the brief of *Williams & Williams* of Oshkosh.

Doemel v. Jantz, 180 Wis. 225.

For the respondent there were briefs by *Hooper &*
*Hooper* of Oshkosh, and oral argument by *Moses Hooper.*

On behalf of the State, upon leave granted, a brief was
filed by *Herman L. Ekern,* attorney general, and *Franklin
E. Bump,* assistant attorney general, and oral argument by
*Mr. Bump.*

A brief was also filed by *John F. Kluwin* and *John C.
Thompson,* both of Oshkosh, as *amici curiæ.*

DOERFLER, J. The only question involved in this appeal
is whether a member of the public can legally enter upon
and use for the purposes of public travel that strip of land
adjacent to plaintiff's upland, and lying between the or-
dinary high and low-water marks, and constituting what is
ordinarily known as the shore, without committing trespass.
It appearing that the public interests may be involved in
this litigation, the attorney general was permitted to inter-
vene and file a brief and participate in the argument before
this court.

Plaintiff is a riparian owner of lands abutting on Lake
Winnebago, and he contends, among other things, that his
grant of land to the lake extends his title to what is known
as the ordinary low-water mark, or, if it should be held
that his title stops at what is known as the ordinary high-
water mark, nevertheless, by reason of being a riparian
owner, he is possessed of the exclusive right of the use of
the shore between ordinary high and low-water marks, and
that any entry thereon by a stranger in either event, for
the purposes aforesaid, constitutes a trespass or a violation
or infringement of his riparian rights. On the other hand,
the defendant and the state contend that plaintiff's title
stops at the ordinary high-water mark, and that the title of
the land constituting the shore between such ordinary high
and low-water marks is held in trust by the state for the
benefit of the public; and further, if it should be held that
plaintiff has a qualified title to the strip in question, that

such strip is subject to a public easement in the interests of the public, not only for the purposes of navigation and the incidents thereto but for the purposes of public travel and public purposes generally.

The precise question involved herein has never come before this court for decision, although it may be said that the rights of riparian owners similarly situated have been declared in numerous adjudications of this court in such a manner as to constitute a fixed rule of property.

By the Ordinance of 1787, passed for the government of the territory of the United States northwest of the Ohio river, it is provided (art. 4) that:

"The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways, and forever free, as well to the inhabitants of the said territory, as to the citizens of the United States, and those of any other states that may be admitted into the confederacy, without any tax, impost, or duty therefor."

This provision of the Ordinance, in substantially the same language, has been incorporated into our constitution and forms a part of what is known as sec. 1, art. IX, thereof.

In *Ill. Cent. R. Co. v. Illinois,* 146 U. S. 387, 13 Sup. Ct. 110, the supreme court of the United States, in an opinion rendered by Mr. Justice FIELD, decided that:

"All lands under navigable waters which were formerly within the public domain vested in the state for public purposes, and that the term 'navigable waters' means waters navigable in fact; that to them, the common-law principles relating to tidal waters and the title to land under the same apply to the fullest extent."

The doctrine so announced in the *Ill. Cent. R. Co. Case* has substantially been declared by this court in the case of *Ill. S. Co. v. Bilot,* 109 Wis. 418, 425, 84 N. W. 855, 85 N. W. 402, and in *Diedrich v. N. W. U. R. Co.* 42 Wis.

248. In the *Bilot Case* it was also held that the United States never had title to the beds of lakes in the so-called Northwest Territory, out of which Wisconsin was carved, excepting only in trust for public purposes, and that the state, upon its admission to the Union, had conveyed to it the title so held by the United States and ever since has maintained and held such title solely for such trust purposes, and that any conveyance in violation of such trust is necessarily void. *McLennan v. Prentice,* 85 Wis. 427, 55 N. W. 764; *Priewe v. Wis. State L. & I. Co.* 93 Wis. 534, 67 N. W. 918; *Ne-pee-nauk Club v. Wilson,* 96 Wis. 290, 71 N. W. 661; *Willow River Club v. Wade,* 100 Wis. 86, 76 N. W. 273; *Pewaukee v. Savoy,* 103 Wis. 271, 79 N. W. 436; *Barney v. Keokuk,* 94 U. S. 324; *Ill. Cent. R. Co. v. Illinois,* 146 U. S. 387, 13 Sup. Ct. 110; *Yates v. Milwaukee,* 10 Wall. 497.

In the early history of the common law the rights of the public in the navigable waters were confined exclusively to navigation, and the public interest in such waters was limited to purposes of navigation. This doctrine was adopted in this country and extended from time to time so as to meet the different and varying conditions as they arose. The term "navigation," which had ordinarily been confined solely to purposes of commerce, was so enlarged as to include the use of the waters for purposes of travel, for fishing, bathing, recreation, and hunting. *Diana Shooting Club v. Husting,* 156 Wis. 261, 145 N. W. 816. But in so enlarging and extending the public uses of navigable waters, the original purpose of the use of such waters for navigation purposes has never been lost sight of, and, in fact, such use is at the very foundation of the public right; and a reading of the case of *Diana Shooting Club v. Husting, supra,* brings home the conviction that this conclusion is correct, for in defining the public use the various purposes for which the public waters may be used, besides navigation for commercial purposes, are declared to be incidents

to navigation. In other words, the extension of the term is a mere corollary to the primary use. That navigation is the foundation of the public use cannot be lost sight of in the consideration of the issue involved in this case, where it is attempted to justify the use of the shore between ordinary high and low-water marks, for the purposes of travel or other similar purposes.

In the *Diedrich Case, supra,* it was held that the rights of a riparian owner are not dependent upon the ownership of the soil under the water, but upon his title to the banks. Such rights cannot be taken from him for private purposes in any event, nor can they be taken for public purposes unless adequate compensation is paid therefor, under the law of eminent domain. *Diedrich v. N. W. U. R. Co.* 42 Wis. 248; *Delaplaine v. C. & N. W. R. Co.* 42 Wis. 214; *Green Bay & M. C. Co. v. Kaukauna W. P. Co.* 90 Wis. 370, 61 N. W. 1121, 63 N. W. 1019; *Water Power Cases,* 148 Wis. 124, 134 N. W. 330. These riparian rights constitute property that may be the subject of bargain and sale, and are a part of the owner's estate in the land, and enter into the actual value. 27 Ruling Case Law, 1071; *Green Bay & M. C. Co. v. Kaukauna W. P. Co., supra; Water Power Cases, supra; Mills v. U. S.* 46 Fed. 738.

This enhanced value, by reason of the incidents connected with the ownership of the soil, also enters into the amount which the riparian owner is obliged to pay in taxes, and a transfer of the property without any reference whatsoever to these rights automatically conveys and includes them. *Ill. Cent. R. Co. v. Illinois,* 146 U. S. 387, 13 Sup. Ct. 110. In 27 Ruling Case Law, at page 1073, it is said, upon the authority of numerous cases cited in the notes, that:

"Riparian rights are the result of that full dominion which every one has over his own land, by which he is authorized to keep all others from coming upon it except on his own terms. They are defined as the rights of the owner of lands upon water to maintain his adjacency to it, and to

profit by this advantage, and otherwise as a right to pre-serve and improve the connection of his property with the water. Those rights are not common to the citizens at large, but exist as incidents to the right of soil itself con-tiguous to and attingent on the water. In such ownership they have their origin, and not out of the ownership of the bed, and they are the same whether the riparian owner owns the soil under the water or not."

The riparian owner also has the right to build piers, har-bors, wharves, booms, and similar structures in aid of navi-gation, and such right is also one which is incident to the ownership of the upland. This private right to so use the public waters was denominated in *Cohn v. Wausau Boom Co.* 47 Wis. 314, 2 N. W. 546, as an intrusion upon the public right, tolerated only in private aid of navigation, and gives way, *ex necessitate rei,* to public measures in aid of navigation. And, as is said in *Stevens Point Boom Co. v. Reilly,* 46 Wis. 237, 49 N. W. 978, "This private right of the riparian owner . . . is subordinate to the public use of a navigable river, and is always exercised at peril of obstructing navigation."

It has also been held that a riparian owner is entitled to the land formed by gradual accretions and as a result of relictions. He also has the right to use the waters for domestic and agricultural purposes, and he can make im-provements necessary to protect his soil from the process of erosion.

These are but few of the many rights of a riparian owner which are necessary incidents to his title to the upland, and such rights are not only generally conceded by the decisions in this state, but by the decisions in practically all the other states where the question has come up for adjudica-tion. But the question as to the right of the public to use the shore between ordinary high and low-water marks, it would appear, has been definitely settled by the decisions of this court. In *Delaplaine v. C. & N. W. R. Co.* 42 Wis.

214, it was held that, as proprietor of the adjoining land and as connected with it, the riparian owner has the right of exclusive access to and from the waters of the lake at that particular place. In *McCarthy v. Murphy,* 119 Wis. 159, 96 N. W. 531, the language used in the *Delaplaine Case* is expressly quoted, adopted, and affirmed. Note also the further pertinent and significant language used by the court in the *Delaplaine Case:*

"It is evident from the nature of the case that these rights [referring to the riparian rights] of user and of exclusion are connected with the land itself, grow out of its location, and cannot be materially abridged or destroyed without inflicting an injury upon the owner which the law should redress. It seems unnecessary to add the remark that these riparian rights are not common to the citizens at large, but exist as incidents to the right of the soil itself adjacent to the water. In other words, according to the uniform doctrine of the best authorities, the foundation of riparian rights, *ex vi termini,* is the ownership of the bank or shore. In such ownership they have their origin. They may and do exist though the fee in the bed of the river or lake be in the state."

In *Clement v. Burns,* 43 N. H. 609, 619, it is held, after a review of many of the leading cases both in the supreme court of the United States and in the state courts:

"From this examination of the adjudged cases it is quite apparent that the principles of the English law have been much modified in the American courts, and that it must now be conceded as an established rule of American law that the owner of uplands adjacent to navigable waters has an interest in the shores, of which he cannot be deprived, even by the sovereign power, without compensation (see 2 Am. Lead. Cas. 224); and the cases are numerous among those cited where for infringing such rights actions of various kinds, including actions of ejectment and trespass *quare clausum fregit,* have been maintained by the riparian owners, especially when the soil between high and low-water mark has been reclaimed by the erection of wharves or the filling

Doemel v. Jantz, 180 Wis. 225.

up of flats. . . . If a writ of entry or trespass *quare clausum fregit* can be maintained for an entry upon the riparian owner, after the soil has been so reclaimed, or while in progress of being filled up, it is difficult to perceive any solid reason for withholding the appropriate remedy when a person enters upon and takes possession of such shore for the erection of wharves or. fishing huts, or of reclaiming the land from the sea, or for the purpose of quarrying rock, removing the soil, or any other purpose not connected with the public right of navigation or fishery. If in these cases the riparian owner has no remedy, the result must be that his interest in the shore is of no value, because he may be deprived of the possession by any person who may choose to occupy it for any purpose whatever. But the law is held otherwise, and the rights of a riparian owner may be vindicated by suit, not only when the soil has been reclaimed from the sea as in *Goff v. Bell,* 2 Zabr. 441, and *Nichols v. Lewis,* 15 Conn. 136, where ejectment was maintained by the owner of the upland ·for. flats adjoining, upon which the defendant had entered and filled them up; but in cases where the soil has not been reclaimed, actions have been maintained as in *Hart v. Hill,* 1 Whart. (Pa.) 137, where it was held that the owner of the upland has the sole right of quarrying stone between high and low-water mark."

After reviewing a number of other authorities the court arrives at the conclusion that:

"The withholding of a remedy in cases of this sort could only be justified upon the ground that the title to the shore of navigable waters is exclusively in the sovereign—a doc-- trine which we think has never been received in its full force in the American courts,—and we can see no practical inconvenience in following the authorities which, overlooking nice technicalities, give to the riparian owner appropriate remedies for any invasion of his rights. Such have been extensively adopted in this country, both in respect to navigable waters and our large inland lakes and rivers, and, so far as we can learn, without any practical evil; and judging from the recent case of *Blundell v. Catterall,* 5 B. & A. 268, where the riparian owner to whom, as lord of the manor, the shore belonged, was allowed to maintain tres-

pass *quare clausum fregit* against a person entering upon the shore to bathe, there is a tendency in the English courts in the same direction."

A careful review of all of the cases above referred to fastens the conviction upon the reader's mind that the public use of the waters in navigable bodies like the meandered inland lakes is confined to and is founded upon the original basis adopted by the English courts, and maintained by the American courts, that such bodies of water constitute highways for navigation purposes, and that in the course of time, in the development of the law and in its application to existing local conditions and in response to public requirements, these rights have been extended so as to include fishing, recreation, boating, bathing, hunting, etc., which are denominated incidents to the rights of navigation. Therefore the use of these waters for the various purposes enumerated and referred to is open to the public when exercising the right of navigation.

By way of resumé of what has heretofore been said, the following principles therefore appear to be firmly established by the jurisprudence of this state and of other states so as to become a part of the common law:

1. The rights of a riparian owner are based upon his title to the ownership of the banks or the uplands.

2. Such ownership gives him exclusive privileges of the shore for the purposes of access to his land and the water.

3. These privileges are valuable privileges incident to his title to the land, of which he cannot be deprived for any private use, and which the public can only acquire from him by purchase, prescription, or by the exercise of the right of eminent domain.

4. That such rights include the right of using the shore for the purposes of building piers, wharves, harbors, or booms in aid of navigation, and of building walls or other protection so as to prevent loss of soil by the process of

erosion.   He obtains the right and title to the soil formed by accretions and relictions.

5. The title to the soil under water in inland navigable meandered lakes is held by the state in trust for the benefit of the public for navigation purposes and its various incidents.

6. In so far as the structures erected by the riparian owner into the water interfere with the public rights of navigation and its incidents, he takes and holds such rights subject to the public rights.

7. When the waters in the lake recede to low-water mark the public has the privilege to use· the water up to ·the water line, and when they extend to the ordinary high-water mark such rights in the public are extended accordingly.

These principles deduced from the cases are so firmly established as to be invulnerable to attack.   So that it becomes evident that whether the title to the shore between ordinary high and low-water marks be deemed in the public or whether it rests in private ownership, the rights of the riparian owner are equally well fixed and established, and any invasion of such rights on the part of a stranger necessarily works an injury to the rights of the riparian owner, for which the law affords proper redress.

It is true, as contended by counsel who have appeared as *amici curiæ,* that it is unfortunate in one sense that this court, in treating of the boundaries of the riparian owner, has used a variety of expressions, such as "water's edge," "natural shore," "water line," "ordinary low-water mark," and "ordinary high-water mark."   In the case of *Mariner v. Schulte,* 13 Wis. 692, it was held that "Proprietors of land on the shore of a pond or lake hold down to low-water mark."   In *Slauson v. Goodrich T. Co.* 94 Wis. 642, 69 N. W. 990, it would appear that the court expressly also held that the riparian owner held title to the low-water mark.   In *Ill. S. Co. v. Bilot,* 109 Wis. 418, 426, 84 N. W. 855, 85

N. W. 402, this court held that "A government patent of land bordering on a lake or pond, regardless of the boundaries thereof according to the government survey, does not convey title to the lands below the line of ordinary high-water mark." In *C. Beck Co. v. Milwaukee*, 139 Wis. 340, 120 N. W. 293, it was held, upon the authority of *Delaplaine v. C. & N. W. R. Co.* 42 Wis. 214, and *Diedrich v. N. W. U. R. Co.* 42 Wis. 248, that "The title to the bed of the lake below ordinary high-water mark is in the state." And in *Diana Shooting Club v. Husting,* 156 Wis. 261, 145 N. W. 816, it was held that "Hunting on navigable waters is lawful when it is confined strictly to such waters while they are in a navigable stage, and between the boundaries of ordinary high-water marks."

A careful reading of all of these cases will disclose but very little conflict, from the standpoint of principle, with respect to the issue involved, and when the principles are applied to the facts in each particular case. The *Beck Case* involved the right of the city of Milwaukee to interfere with the removal of sand by the riparian owner below ordinary high-water mark, on the ground that such removal had a tendency to and did affect the harbor, and consequently the rights of navigation. This ruling is not in conflict with any doctrine pronounced by this court. The riparian owner's rights to the shore are exclusive as to all the world, excepting only where those rights conflict with the rights of the public for navigation purposes. What was said in the *Diana Shooting Club Case* on the subject of the rights of a hunter to pursue his game up to the ordinary high-water mark, merely affirmed the public right to pursue the sport of hunting to the ordinary high-water mark of a navigable river while the waters of the river actually extended to such mark. What is said in the *Bilot Case* had reference merely to the absolute title of the riparian owner up to ordinary high-water mark. The qualified title contended for by the plaintiff herein to low-water mark is not disputed in that case, but

it can be reasonably inferred from what is therein said that as to the strip between ordinary high and low-water marks the title of the riparian owner was only a qualified title, not an absolute title, and that when the waters extended to the ordinary high-water mark the strip between high and low-water marks was subject to the trust under and pursuant to which the state has title for the benefit of the public for the purposes of navigation and the incidents thereto belonging. This doctrine also seems to be in perfect harmony with the natural order of things. During certain periods of the year when precipitation is large and when the waters of the lakes are swelled by the increasing inflowing volumes coming from springs, rivers, creeks, and the flowage of surface water and the precipitation in the form of rain, the lake exercises its dominion over the land to the high-water mark. This dominion, however, is not permanent. Upon the seashore, where the waters are affected by the tide, it is intermittent. As to inland lakes and rivers, such assertion of dominion on the part of nature is periodical. So that it would appear but logical to hold that when nature, in pursuance to natural laws, holds in its power portions of the land which at periods of the year are free from flowage, then during such periods the strip referred to is subject to all the rights of the public for navigation purposes. On the other hand, when the waters recede these rights are succeeded by the exclusive rights of the riparian owner. So that during periods of high water the riparian ownership represents a qualified title, subject to an easement, while during periods of low water it ripens into an absolute ownership as against all the world with the exception of the public rights of navigation, and with those rights no interference will be tolerated where the acts affect or have a tendency to affect the public rights for navigation purposes.

If the rights of riparian owners had not attached or been declared by the courts, a different situation would be presented. Early in the history of this state this court, in har-

mony with other courts, has firmly declared that the title of a riparian owner on a navigable inland meandered lake extends to low-water mark. In the early period of our history the lands surrounding these lakes were the property of the state. From time to time the state made grants to private individuals of lands abutting upon the inland waters, and it might be said that by far the greater portion of these grants were executed subsequent to the solemn declaration of the rights of riparian owners by this court. These rights were always considered valuable, and as a result of such declarations the doctrines pertaining to riparian rights have become fixed rules of property. Whatever may be our individual inclinations or desires or our views as to propriety or the public welfare, we cannot disturb the interests which have so become vested.

From our views as expressed herein we arrive at the inevitable conclusion that the demurrer in the instant case was properly sustained.

*By the Court.*—Order sustaining the demurrer of the lower court affirmed.

CROWNHART, J., took no part.