JOINT SCHOOL DISTRICT NO. 1 OF CITY OF CHILTON, and others, Plaintiffs-Appellants, v. CITY OF CHILTON, Defendant-Respondent.†

*No. 75-261. Submitted on briefs March 30, 1977.—*
*Decided May 17, 1977.*
(Also reported in 253 N.W.2d 879.)

† Motion for rehearing denied, with costs, on July 1, 1977.

For the appellant the cause was submitted on the briefs of *Bonk, Lutz & Hertel,* attorneys, of Chilton, and *Scott H. Millard,* of counsel, of Delavan.

For the respondent the cause was submitted on the brief of *William Engler, Jr.,* and *Engler & Ondrasek,* attorneys, of Chilton, and *Robert D. Sundby,* of counsel, of Madison.

CONNOR T. HANSEN, J. In 1952, the schools in the City of Chilton were operated as part of a city school district. The city issued general obligation bonds in the amount of $375,000 to improve existing school buildings. An annual irrepealable tax was levied to retire the bonds and pay interest. Pursuant to sec. 67.11, Stats. 1951,[1]

---

[1] *"67.11* Sinking fund, sources and uses. (1) Every county, town, city, or village indebted on account of outstanding municipal bonds shall immediately after the issue of such bonds establish in its treasury a fund separate and distinct from every other fund, designate it as the sinking fund for the particular bond issue, describing it, upon which the indebtedness arose, and shall maintain such fund until such indebtedness is fully paid or otherwise extinguished. The sources of said fund shall be:

the city created a sinking fund to segregate the premium, accrued interest, and moneys raised by taxation to retire the bonds.

"First. All moneys accruing to the borrowed money fund prescribed by subsection (3) of section 67.10 which at any stage are not needed and which obviously thereafter cannot be needed for the purpose for which the money was borrowed.

"Second. All moneys raised by taxation pursuant to subsection (10) of section 67.05 for the purpose of paying said bonds.

"Third. Such moneys, derived from licenses or other sources, the expenditure of which is not otherwise provided for by law, as the governing body may elect to carry into the sinking fund.

"Fourth. The premium, if any, for which the bonds have been sold over and above par value and accrued interest.

"Fifth. Such further sums, raised by taxation annually, or from time to time, as may be necessary to make the contributions to the fund from all sources in each year, beginning with the first year, amount in the aggregate to a sum sufficient to pay all interest maturing in such year and not less than five per cent of the original indebtedness. The levying and collection of such taxes are authorized and commanded; but the governing body may, in its discretion, levy and collect larger sums than the sums so commanded, in order to speed the payment of the bonds.

"(2) Proper orders or warrants shall be drawn upon the sinking fund each year to pay interest and principal maturing in such year upon said bonds. Taking care that enough cash is always retained in the fund to provide for such annual payments the surplus, if any there be, may be loaned or invested under the direction of the proper governing body, as follows:

"First. In outstanding bonds for the payment of which the sinking fund is required, at any price not exceeding the principal, accrued interest and a premium not to exceed three years' interest on such bonds; but no such bonds shall be purchased except on bids received at a fixed time and place, notice of which shall have been given in the official newspaper of such municipality for not less than two weeks before the time fixed. If there be no such paper, notice shall be given in such manner as the governing body shall direct; and such bonds when purchased shall immediately have written on the face thereof a statement, signed by the clerk of such municipality, that the same have been taken up and cannot again be negotiated or made obligatory; and all such bonds shall be deemed paid and extinguished and shall be immediately canceled.

At the time of the bond issue the boundaries of the city were coterminous with those of the city school district and certain outlying municipalities utilized the schools on a tuition basis. However, from 1953 through 1956, portions of outlying municipalities were annexed to the city for school purposes only. Under the new arrangement, each annexed area paid its proportionate

"Second. In interest bearing bonds of the United States.

"Third. In any bonds or securities issued under the authority of such municipality, whether the same create a general municipal liability or a liability of the property owners of such municipality for special improvements made therein.

"(3) Investments of the second or third class continue a part of the sinking fund. The bonds representing such investments may be sold or hypothecated by the governing body at any time, but the money received shall likewise remain, until used, a part of the sinking fund. Any such sale of municipal bonds shall be for a sum not less than par value and accrued interest. All payments by the municipality in extinguishment of principal or interest of bonds representing investments of the third class shall be paid into the sinking fund, and, for the purpose of making such payments, the municipality shall levy and collect every tax that it would be legally obligated to levy and collect if such bonds were still outstanding in the hands of purchasers and had not been purchased as an investment.

"(4) Money shall not be withdrawn from a sinking fund and appropriated to any purpose whatever other than the purpose for which the fund was instituted until that purpose has been accomplished.

"(5) Any surplus in the sinking fund after all of the bonds for the payment of which the fund was instituted have been paid and canceled, and after all investments of the second or third class have been finally disposed of or realized upon, shall be carried into the general fund of the municipal treasury.

"(6) Every municipal sinking fund maintained at the time of the enactment of this chapter under laws in force up to that time, but then repealed, may be continued pursuant to those laws, notwithstanding their repeal, until the purpose of the fund has been accomplished; or it may be continued and administered in accord with this section."

share of the city school district budget, which included sums to retire the bond issue.

Effective July 1, 1957, the city school district was dissolved and the joint school district was created under the common school district plan. The joint school district was a financially independent and separate taxing entity. Each year, following 1957, the joint school district levied a school tax against all municipalities in the district, which included an amount sufficient to pay the annual bond retirement requirements plus interest. This sum was remitted directly to the city.

At the time of reorganization, a division of assets was made between the city and the joint school district. In the division no mention was made of the sinking fund assets. Apparently as a part of the division the city made a remittance to the joint school district of $174,-229.05. The invoice from the city to the joint school district states, "School balance due the new School district."

In October, 1963, the joint school district issued to the city a series of interest-free promissory notes, payable to the city, in amounts sufficient to retire the bonds then outstanding, plus interest. As a result of this action, and pursuant to statute,[2] the city was no longer required to include the school bond liability in computing its legal debt limit.

In 1963, the sinking fund consisted of the promissory notes, United States treasury notes maturing June 15, 1972, and cash. Prior to 1963, the interest earned by the investments in the sinking fund was accumulated in the fund. Thereafter, however, interest earned was included in general city revenues.

The 1952 bond issue was retired upon the last payment of principal and interest on May 1, 1972. At that time it was the intention of the city to devote all moneys remaining in the sinking fund exclusively to city purposes. The joint school district alleged this sum to be $46,966.61.

---

[2] Sec. 40.807(4a) (a), (b) and (c), Stats. 1963.

On May 11, 1972, the board of directors of the joint school district filed a claim with the city to recover $46,966.61, plus interest, representing the premium on the bonds, accrued interest, interest earned on the proceeds of the bond issue and interest earned on investment of the sinking fund. Of this amount, it was claimed, $36,880.12 was deposited in the sinking fund. Additionally, subsequent to 1962, the city allegedly collected $10,-086.49 in income on the investments which amount was deposited in the city's general account.

The city denied the claim, and this action followed.

Three issues are presented:

1. Did the school board have authority to present a claim to the city as required by sec. 62.25, Stats., and to commence and prosecute the subsequent action?

2. Does sec. 893.19(3), Stats., bar the cause of action of the school district?

3. Did the trial court err in determining that the city was entitled to the funds remaining in the sinking fund after the bonds had been retired?

## AUTHORITY OF THE BOARD.

The board of directors of the joint school district filed a claim against the city for the surplus sinking fund assets on May 11, 1972. The claim was denied on May 16, 1972. The instant action was commenced on October 3, 1972. On July 23, 1973, the joint school district ratified the action of the school board.

It appears, without question, that both the initial claim and the subsequent action were filed and commenced without specific approval or direction of the joint school district. The city, therefore, asserts that the trial court erred in rejecting its contention that the school board and its president lacked authority to file the claim against the city and to initiate and prosecute the action. We concur with the conclusion reached by the trial court.

Section 62.25, Stats.[3] requires that a "claimant" present his claim to the city council as a prerequisite to any subsequent action on the claim. This court has held that the reason for requiring a notice of claim to be presented is to give the city an opportunity to settle the claim without resorting to costly extended litigation. *Sambs v. Nowak*, 47 Wis.2d 158, 166, 177 N.W.2d 144 (1970); *Pattermann v. Whitewater*, 32 Wis.2d 350, 357, 145 N.W. 2d 705 (1966); *Firemen's Ins. Co. v. Washburn County*, 2 Wis.2d 214, 226, 85 N.W.2d 840 (1957); *Wentworth v. Summit*, 60 Wis. 281, 282, 19 N.W. 97 (1884). There is

---

[3] *"62.25 Claims and actions.* (1) CLAIMS. (a) No action shall be maintained against a city upon a claim of any kind until the claimant shall first present his claim to the council and it is disallowed in whole or in part. Failure of the council to pass upon the claim within 90 days after presentation is a disallowance.

"(b) After disallowing a claim in whole or in part the council shall not thereafter allow the same.

"(c) The clerk shall cause to be served on the claimant notice of any disallowance if the claimant in writing furnished the address of his usual place of abode. The notice shall be served by a police officer, without fees, in the manner of service of summons. If the claimant be a nonresident and he furnished the address of his usual place of abode, the notice shall be sent to such address by registered mail and receipt therefor, signed by the claimant, or the returned registered letter, shall be proof of service.

"(d) The claimant may accept payment of a portion of his claim without waiving right to recover the balance. No interest shall be recovered on any portion of a claim allowed after a city order is drawn and made available to the claimant. If in an action the claimant recovers a greater sum than was allowed, he shall recover costs, otherwise the city shall recover costs.

"(e) Disallowance by the council shall bar any action founded on the claim unless brought within 6 months after service of notice of disallowance, or after disallowance if the address was not furnished as aforesaid."

no suggestion in the record that the city lacked this opportunity.

■

Section 120.12, Stats.,[4] sets forth the duties of the school board. That section constitutes authority for the board to have filed the initial claim against the city. The filing of the claim itself does not amount to the initiating or prosecution of a lawsuit. It relates to the management of the affairs of the school district. Nothing in either ch. 62 or ch. 120, Stats., precludes the board from qualifying as a proper "claimant" under sec. 62.25. The record reflects that the school board and not its president individually filed the claim. Therefore, we need not consider the authority of the president acting individually.

The city also argues that the board did not possess authority to initiate and prosecute the action. Sec. 120.10 (14), Stats., provides:

"*120.10   Powers of annual meeting.* The annual meeting of a common or union high school district may:

". . .

"*(14) LEGAL PROCEEDINGS.* Direct and provide for the prosecution or defense of any action or proceedings in which the school district is interested."

The city contends that pursuant to sec. 120.10 (14), Stats., only the district is vested with the authority to initiate and prosecute the action.

In *State ex rel. Hawkins F. H. School Dist. v. Nelson,* 212 Wis. 116, 249 N.W. 172 (1933), this court established

---

[4] "*120.12 School board duties.* The school board of a common or union high school district shall:

"*(1)* MANAGEMENT OF SCHOOL DISTRICT. Subject to the authority vested in the annual meeting and to the authority and possession specifically given to other school district officers, have the possession, care, control and management of the property and affairs of the school district."

that an action may be instituted and maintained by the board without the specific approval of the district in those cases in which the management, control and conservation of school district property required the speedy application for process. *See also: State ex rel. Geneva School District No. 1 v. Mitchell,* 210 Wis. 381, 245 N.W. 640 (1933) ; and *School District No. 8 v. Arnold,* 21 Wis. 657 (1867).

The considerations presented in the above cited cases are present here and support a holding that the board possessed the authority to initiate this suit. The sinking fund constituted property which the board strongly asserted properly belonged to the district. The city had in the past diverted portions of that property to its own use and it further expressed its intention to continue to do so in the immediate future. The board had already filed its claim with the city. The claim had been denied. The board could reasonably conclude that under the six months' time limitation imposed by sec. 62.25 (1) (e), Stats., immediate action was required.

The ratification of the action of the board by the district on July 23, 1973, attests to the fact that the interests of the board and the district were identical in preserving for the district the surplus moneys in the sinking fund. However, the ratification by the district did not in and of itself constitute authority to commence suit under sec. 120.10 (14), Stats. This is because the ratification was untimely.

In *Town of Nasewaupee v. City of Sturgeon Bay,* 77 Wis.2d 110, 117, 251 N.W.2d 845 (1977), this court said:

"Ordinarily, a subsequent ratification relates back to the time of the original transaction. *Saros v. Carlson,* 244 Wis. 84, 11 N.W.2d 676 (1943). However, that rule is not applicable when the rights of others have intervened by the passage of time. The rule presupposes that the principal who could have acted initially retains that power at the time of the ratification. . . ."

If the board had not commenced action on October 3, 1972, but had delayed doing so until ratification by the district on July 23, 1973, the city could properly have asserted the six months' limitation defense prescribed in sec. 62.25(1)(e), Stats.

Under the facts of this case the board had authority to both file the claim and to initiate and prosecute the action.

### LIMITATION OF COMMENCEMENT OF ACTION.

The city contends that any cause of action based upon obligations arising from the sale of bonds and the investment of sinking fund moneys arose upon the dissolution of the city school district on July 1, 1957. The city argues that the bond premium, accrued interest and earned interest at that time constituted an apportionable asset and that any action based upon the failure to apportion is barred by sec. 893.19(3), Stats.[5] The city further contends that any cause of action to recover interest earned subsequent to July 1, 1957, would have accrued as the interest was earned and that any subsequent actions not commenced within six years of the time that interest was earned would also be barred by sec. 893.19 (3).

Section 893.48, Stats.[6] provides, however, that the statute of limitations runs from the time a cause of ac-

[5] If not brought within six years of the accrual of the action, sec. 893.19(3), bars:

"*(3)* An action upon any other contract, obligation or liability, express or implied, except those mentioned in ss. 893.16 and 893.18."

[6] "*893.48. Computation of time, basis for.* The periods of limitation, unless otherwise specially prescribed by law, must be computed from the time of the accruing of the right to relief by action, special proceedings, defense or otherwise, as the case

tion arises. The record in this case reflects that the apportionment of sinking fund moneys was not specifically mentioned in the 1957 dissolution agreement. The record does, however, contain a copy of a letter from the lawyer for the district directed to the school board for the school district dated November 6, 1957. This communication advises the school board that the lawyer had appeared at the city council meeting the previous evening and discussed with the council the sinking fund assets and in particular the effect of sec. 67.11, Stats. 1951. The letter, among other things, states that the city council had "apparently informally agreed not to touch the money until [the bond] retirement in 1972."

■

Both sections 67.11(4) and 67.11(5), Stats. 1951, which govern the operation of the sinking fund, require that the moneys therein remain inviolate until the bonds were retired in May, 1972. We are of the opinion that any cause of action the school district had could only accrue at such time as the bonds were retired and the surplus moneys were definite as to amount and legally capable of disbursement. That was in May, 1972, and the action was timely commenced.

## SURPLUS IN THE SINKING FUND.

The principal issue in this case involves an interpretation of sec. 67.11(5), Stats. 1951[7] which at all relevant times provided that "[a]ny surplus in the sinking fund

---

requires, to the time when the claim to that relief is actually interposed by the party as a plaintiff or defendant in the particular action or special proceeding, except that as to a defense, set-off or counterclaim the time of the commencement of the plaintiff's action shall be deemed the time when the claim for relief as to such defense, set-off or counterclaim is interposed."

[7] *See:* fn. 1.

after all of the bonds for the payment of which the fund was instituted have been paid and canceled . . . shall be carried into the general fund of the municipal treasury." The question is which "municipal treasury"—that of the city or of the joint school district—has legal claim to the surplus which accrued between 1952 and 1972?

The trial court decided those funds belonged to the city. We arrived at the opposite conclusion and hold that the funds belonged to the joint school district.

The city relies heavily on the *Board of Education v. Racine,* 205 Wis. 489, 238 N.W. 413 (1931). In that case the dispute was between the board of education of the city school system and the city. It was there decided that the funds in dispute were the property of the city.

The school district relies principally on *West Milwaukee v. West Allis,* 31 Wis.2d 397, 143 N.W.2d 19 (1966), in which it was held that interest derived from funds held by the city for school purposes accrued to the benefit of all the territory in the school district, and not solely to the benefit of the city.

In *Racine, supra,* the schools were operated under a city school system. It was there determined that the board of education, which claimed the moneys, was merely an agency of the city with the city's common council having ultimate control over taxation and related matters. We concluded that where schools were operating under the city school plan, the city owned the funds and property used in connection with its school system. This court stated that there was an absence of any legislative intent to create a school district which would amount to a separate entity distinct from the city. Since the common council controlled fiscal affairs, ". . . [t]he contrary [was] shown by the method followed in arranging for the raising of school moneys." *Racine, supra,* 492.

In *West Allis, supra,* the plaintiff-village was attached to the defendant-city for school purposes only. In this

respect, the West Allis school district was identical to the City of Chilton School District from 1953 to 1957, when it operated as a city school district with outlying areas attached for school purposes only.

*West Allis, supra,* distinguished *Racine, supra,* by the manner in which fiscal powers over the school district were exercised. Under the statutory plan in *West Allis, supra,* in which outlying areas were attached for school purposes only, the board of education prepared an estimate of school expenses. If approved, the city clerk apportioned to the outlying areas their proportionate shares of expenses and such shares were then certified to the clerks of the municipalities in which the attached territories lay. These areas paid a proportionate share of the tax burden. In *Racine, supra,* the sharing of the burden of school expenses and a corresponding sharing of the decision making authority to incur expenses did not exist.

Where the city school district includes non-city areas for school purposes only, as in *West Allis, supra,* fiscal controls including the power to approve the school budget and to levy the general property tax for school purposes vests in a board consisting of the city council or commission, town chairman and village presidents, each of whom has voting power according to the proportion of equalized valuation of the school district which is within his or her municipality. Sec. 40.807(2) and (3), Stats. 1965.[8] *West Allis, supra,* denominated this board the "fiscal board" and this language was subsequently codified as sec. 120.50, Stats. 1967, which codification represents the present state of the law.

*West Allis, supra,* 412, distinguished *Racine, supra,* on the basis of the shared powers and obligations of the fiscal board, and stated:

[8] Formerly sec. 40.50(4)(b) and (5), Stats. 1951.

"Under the present statutes, a city like West Allis not only has a wider territory for school purposes than it does for ordinary municipal purposes, but it also has a body with control of tax and fiscal matters (the fiscal board) which is representative of the wider territory and which is different from the body with control of ordinary municipal tax and fiscal matters, the common council. Thus we do not find the *Racine* decision controlling as to a city school district which is the product of a plan of reorganization, and conclude as did the circuit court that it is equitable that interest on school funds should augment the funds under the control of the fiscal board rather than the funds under the control of the common council."

It is acknowledged that for the period of 1952 to 1957, the date of the bond issue to the date of the creation of the joint school district, the "fiscal board" referred to in *West Allis, supra,* did not actually exist in the instant case. This is true notwithstanding the fact that the statutory plan considered in *West Allis, supra,* was in effect during the period of time when the City of Chilton added outlying areas for school purposes and included in the assessment for school purposes against such added districts a proportionate share of the bond payment costs. *See:* sec. 40.807, Stats. 1953. We do not find this attempted distinction between *West Allis, supra,* and the instant case persuasive. Insofar as the retirement of the bond issue is concerned, everything that could have been accomplished by the establishment of a "fiscal board" was in fact accomplished by agreement between the City of Chilton and the areas attached for school purposes. Each added area was periodically advised of and paid its share of the total school operation costs which included a proportionate share of bond retirement expenses. The actual existence of a "fiscal board" during this period of time would have added nothing that was not otherwise accomplished by agreement be-

tween the participating governmental units. The legislative intent was, in fact, complied with, if not by formal action, by actual practice and agreement.

We are of the opinion that the rationale of *West Allis, supra,* dictates the result in the instant case. The city then argues that should this be the case, *West Allis, supra,* should not be given retrospective application. We find this argument unpersuasive. Under sec. 67.11, Stats. 1951, interest accruing to the proceeds of the bond issue which interest was not spent for the purposes for which the bonds were issued was required to be deposited in the sinking fund. Once in the fund, this money could not be diverted until the indebtedness was fully paid or otherwise extinguished.[9] Thus, there could be no legal diversion from the fund until the bonds had matured and been paid in 1972. To the extent, if any, that funds were diverted prior to extinguishing the bonded indebtedness, the city was trustee for the school district. *See: Bayside v. Milwaukee,* 267 Wis. 448, 456, 66 N.W.2d 129 (1954).

*Bayside, supra,* was a proceeding for division of assets and liabilities following incorporation of the village out of a part of the town. In its division the trial court apportioned moneys in a rubbish-removal fund and a utility district fund. This court held that because these funds were raised by special taxes levied upon the property in the districts, they were impressed with a trust, stating at page 456:

". . . these two special funds constituted trust funds which could not be diverted to any other purpose . . . and . . . the governing body of the municipality has no power to divert to other uses moneys impressed with a trust. . . ."

In the case before us, the trial court concluded that the sinking fund reserves constituted an apportionable

---

[9] *See:* sec. 67.11(1) and (4), Stats. 1951, fn. 1.

asset and that any right or title the joint school district had to such asset became merged in the apportionment agreement. This holding, however, is contra to *Bayside, supra,* which held the rubbish-removal fund and utility fund non-apportionable. Similarly, in *Miller v. Milwaukee,* 182 Wis. 549, 196 N.W. 235 (1924), it was held that interest earned on metropolitan sewerage bonds could not be diverted to general purposes of the city of Milwaukee. Because the sewerage district contained property without as well as within the city, all of which was taxed, the city sewerage commission was held to be a trustee for the broader based metropolitan sewerage district.

Upon reorganization the joint school district assumed the outstanding indebtedness of the school bonds and the city was freed from accounting for the indebtedness as a legal debt.

Sec. 40.807 (4a) (b), Stats. 1963, provided:

". . . (b) All school property other than vocational school property of a city or city school district then operating under the city school plan and situated in the unified school district at the time of its creation; and all school property of any city or city school district which shall hereafter abandon the city school plan in favor of a common or unified school district; and all school property of any city or city school district which has heretofore abandoned the city school plan in favor of a common or unified school district; shall be sold by such city or city school district to the unified or common school district which thereafter shall assume the operations of the city schools at a price equal to the principal amount of the then outstanding obligations of such city issued for such school purposes. The unified school district or common school district may issue its bonds or promissory notes pursuant to ch. 67 to pay the cost of purchasing such school property. The city shall deposit the proceeds of the sale of the school property in the sinking fund or funds created for

the payment of its obligations issued for school purposes, and the indebtedness of the city shall, for purposes of computing its legal debt limit, be deemed to be reduced by the amount of such deposit. The municipal treasurer shall invest these sinking fund moneys in the name of the city in compliance with s. 66.04 (2). Bonds and notes issued by school districts for the purposes provided in this subsection shall not be subject to referendum. The purchase agreement shall include an irrevocable clause providing that the school district shall pay annually to the city a sum of money equal to the amount in which the interest received by the city on account of the investment herein required is less than the amount of interest paid by the city on the bonds of the city for school purposes other than vocational schools."

Pursuant to the foregoing statute, the promissory notes issued by the joint school district became a part of the sinking fund established for the payment of the bonds originally issued by the city for school purposes. The promissory notes evidenced obligations which were assumed by and were for the benefit of persons without as well as within the city. All those who shared the burden of the debt should also share in accretions to the fund established to retire it.

We, therefore, conclude that the surplus moneys in the sinking fund belong to and are assets of the joint school district. The judgment of the trial court is reversed and the cause remanded for further proceedings consistent with this opinion.

*By the Court.*—Judgment reversed and cause remanded.