# W.H. PUGH COAL COMPANY, Plaintiff-Respondent,††

## v.

# STATE of Wisconsin, Defendant-Appellant,†
# COUNTY OF RACINE, Defendant.

Court of Appeals

*No. 89-1746. Submitted on briefs May 16, 1990.—Decided August 8, 1990.*

(Also reported in 460 N.W.2d 787.)

††Petition to cross-review denied.

†Petition to review denied.

622

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Donald J. Hanaway,* attorney general, and *Diane M. Nicks* and *Daniel S. Farwell,* assistant attorneys general.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *William C. Lewis, Jr.,* of *Stolper, Koritzinsky, Brewster & Neider, S.C.,* of Madison; and *John S. Burgess* and *John Barry Stutt* of *Stewart, Peyton, Crawford, Crawford & Stutt* of Racine.

Before Nettesheim, P.J., Scott, J., and Circuit Judge Daniel P. Anderson, acting.

SCOTT, J. A jury determined that the state of Wisconsin effected a temporary taking of property belonging to the W.H. Pugh Coal Company without paying Pugh just compensation. The state appeals, challenging the underlying "taking," the amount and allocation of damages and the propriety and reasonableness of the attorneys' fees awarded Pugh. We affirm the damage award flowing from the taking but reverse Pugh's attorneys' fees award and reject Pugh's request for double costs. We grant, however, Pugh's request for certain of its appellate attorneys' fees.

This appeal represents the latest chapter in a lengthy saga of litigation involving a small tract of land on the shore of Lake Michigan. The pertinent facts are undisputed. In 1900, Pugh's predecessor-in-interest granted an easement to the United States government. The easement gave access to a lifesaving station built on the lakebed between the shore and a more remote lighthouse. The deed provided that the grantor and his successors-in-interest would retain ownership of the land. It also provided that, upon the government's abandonment

of the lifesaving station, all of the government's right, title and interest would revert to the grantor or his successors.

Over time, the areas between the lighthouse and the shore became filled in by accretion, forming a continuous extension of the Pugh property. The tract at issue is an approximately six-tenths acre parcel of accreted land, bounded on the east by the Racine harbor and on the west by property on which Pugh has long operated a coal, oil and road salt supply and storage business.

When the federal government ceased its Coast Guard operations in 1971, a local water safety operation was continued on the site. Pugh sued under the terms of the 1900 deed. *W.H. Pugh Coal Co. v. United States,* 418 F. Supp. 538 (E.D. Wis. 1976). When that litigation ended in 1976, the federal government quitclaimed its interest to the state. The state, in turn, leased the parcel to Racine county for the operation of a county water safety patrol. At no time did the state commence eminent domain proceedings under ch. 32, Stats.

Pugh then brought a quiet title action against the state and county to determine ownership of the accreted property. *W.H. Pugh Coal Co. v. State,* 105 Wis. 2d 123, 312 N.W.2d 856 (Ct. App. 1981) ( *"Pugh I"*). There we determined that Pugh had always been the rightful owner. *Id.* at 127–28, 312 N.W.2d at 858. Pugh took actual possession in February 1982.

Finally, Pugh brought this action under the just compensation clause of the Wisconsin Constitution. Wis. Const. art. I, sec. 13. Asserting that the state's occupation of the property constituted a temporary taking, Pugh sought damages for the loss of the use of its property during that time.[1] Prior to trial, all parties stip-

[1]The damages phase of the case actually began in 1977 when Pugh filed a claim with the State Claims Board, as directed by

ulated to a bifurcation of the damages and attorneys' fees portions of the trial.

After a six-day trial on the damages issue, the jury found that the state and county had prevented Pugh from using the property. As just compensation, it awarded Pugh $135,000 from the state and $45,000 from the county.[2] The parties then litigated the issue of Pugh's attorneys' fees. Sitting without a jury, the trial court awarded Pugh $150,873.36 in attorneys' fees and costs. Other relevant facts will be related as necessary.

## I. TAKING

The crux of the state's appeal lies in its contention that there was no taking of Pugh's property in the first instance. We disagree.

Just compensation is owed when private property is taken for public use. Wis. Const. art. I, sec. 13. A "taking" occurs when the government restriction placed on the property deprives the owner of all, or substantially all, of the beneficial use of the property. *Zinn v. State,* 112 Wis. 2d 417, 430, 334 N.W.2d 67, 73 (1983).

Until title was settled in *Pugh I,* the county, through a lease from the state, occupied the property to the exclusion of Pugh. In *Pugh I,* we expressly stated that "the fact that the State holds *the lake bed* in public trust is not sufficient to grant title to *accretions* on a

---

sec. 16.007, Stats. That claim and an additional one were both denied in 1982. Pugh then introduced legislation to obtain payment for the combined claims; that legislation was rejected, paving the way for this suit. *See* sec. 775.01, Stats.

[2]Pugh and the county later settled. Consequently, the county is not a party to this appeal.

riparian owner's land without just compensation." *Pugh I,* 105 Wis. 2d at 129, 312 N.W.2d at 859 (emphasis added). The state's attempt to resurrect a challenge to the ownership of the accreted property is barred by *res judicata.*

The state then argues that even if the matter of title was settled in *Pugh I,* Pugh's ownership of the accreted property, a former lakebed, is subordinate to the state's navigational servitude. *See De Simone v. Kramer,* 77 Wis. 2d 188, 197, 252 N.W.2d 653, 657 (1977). We agree with the general proposition, and we have said as much in *Pugh I. Pugh I,* 105 Wis. 2d at 128, 312 N.W.2d at 858. The question, however, is whether the navigational servitude encompasses a water patrol station. It does not.

Historically, the public right in navigable waters was confined solely to purposes of navigation relating to commerce. *Doemel v. Jantz,* 180 Wis. 225, 229, 193 N.W. 393, 395 (1923). The term "navigation" has since been broadened to include use of the waters for travel, fishing, recreation and hunting, yet the original purpose remains at the heart of the public right. *Id.* Other uses of public waters are merely incidents to navigation, "mere corollar[ies] to the primary use." *Id.* at 229–30, 193 N.W. at 395.

Thus, a riparian owner's private rights give way only to public measures *in aid of navigation.* In other words, limitations on private rights are imposed to prevent *obstruction of navigation. Id.* at 231, 193 N.W. at 396. Operation of a county water patrol is an incident to navigation. It is not an activity concerned with preventing the obstruction of navigation.

We therefore conclude that the navigational servitude doctrine does not apply in this case. The state did not hold title to the accreted property, yet it nonetheless occupied the site. Since that occupation deprived Pugh of the beneficial use of its property, a taking occurred and just compensation is owed. Accordingly, we next examine whether the compensation Pugh received was "just."

## II. DAMAGES

The state advances a number of challenges to the award of damages the jury determined would justly compensate Pugh, among them that: the statute of limitations precluded certain of the damages; some of the expert testimony was inadmissible as a matter of law; the jury had no basis upon which to allocate the damages; and prejudgment interest was wrongly awarded. None of these arguments is persuasive.

### A. Statute of Limitations

The state first argues that because the complaint was filed July 20, 1983, damages occurring prior to July 20, 1977 are unrecoverable. *See* sec. 893.52, Stats. We disagree.

For the statute of limitations to begin to run, a claim must be definitely fixed and not continuing. *See Joint School Dist. No. 1 of Chilton v. City of Chilton,* 78 Wis. 2d 52, 62-63, 253 N.W.2d 879, 884 (1977). Pugh's claim became fixed when it prevailed as owner of the property in *Pugh I.* That case was decided October 14, 1981 and Pugh took actual possession on February 15, 1982. Pugh asserts that to require it to have filed earlier would produce the absurd result of having to file a law-

629

suit each day after six years from the earliest date of possible temporary taking. We agree with Pugh that this would have been "administratively senseless and obviously burdensome."

## B. Amount of Damages

Several experts testified that the amount of Pugh's damages could be ascertained by determining what Pugh could have earned through expansion of its bulk storage facility, conversion of existing structures to a restaurant and residence, and investment in treasury bills. The state asserts that the "lost profits" testimony was inadmissible as a matter of law. It claims that the proper measure of damages in just compensation cases is "fair market value" or "fair rental value" as measured by comparable sales. It also challenges the testimony as impermissibly speculative.

The admission of evidence touching upon the value of the appropriated property must be left largely to the discretion of the trial court. *See Leathem Smith Lodge, Inc. v. State,* 94 Wis. 2d 406, 409, 288 N.W.2d 808, 810 (1980). Our review is thus limited to whether the trial court properly applied the law to the facts of record. *Id.* at 409–10, 288 N.W.2d at 810.

The constitution does not define "just compensation." In permanent takings cases, however, it generally is held to be fair market value, *see Kruescher v. Wisconsin Elec. Power Co.,* 27 Wis. 2d 351, 134 N.W.2d 487 (1965), established by comparable sales. *Leathem Smith,* 94 Wis. 2d at 410–13, 288 N.W.2d at 810–12.

In certain instances, however, compensation based solely on market value is inadequate and lost rent and other consequential damages may be awarded. *Luber v. Milwaukee County*, 47 Wis. 2d 271, 280-81, 177 N.W.2d 380, 385 (1970). Temporary takings in particular pose unique valuation considerations. *See United States v. Pewee Coal Co.*, 341 U.S. 114, 119-20 (1951) (Reed, J., concurring); *see also Kimball Laundry Co. v. United States*, 338 U.S. 1, 21-22 (1949) (Rutledge, J., concurring). With a temporary taking, "the proper measure of compensation is the rental that probably could have been obtained," *Kimball Laundry*, 338 U.S. at 7; in other words, "the reasonable value of the property's use." *Pewee Coal Co.*, 341 U.S. at 117. Thus, evidence of lost income, shown to a reasonable degree of certainty, may be considered when determining just compensation. *See Kimball Laundry*, 338 U.S. at 16; *see also Pierce v. Platte Valley Public Power & Irrig. Dist.*, 11 N.W.2d 813, 816 (Neb. 1943).

Valuation is not necessarily dependent on the use to which the property was being put by its owner at the time of the taking but may be determined by the highest and best use, present or prospective, for which it is adapted and to which it reasonably might be applied. *Bembinster v. State*, 57 Wis. 2d 277, 283, 203 N.W.2d 897, 900 (1973).

Pugh's two experts testified that the highest and best use of the property was as a bulk salt storage facility, consistent with the use to which the adjoining Pugh property was being put at the time. These estimates were based on actual income figures from Pugh's adjacent storage business, and buttressed by showings of additional demand.

Since expansion of the storage business hinged on the destruction of the old Coast Guard buildings, one of the experts also testified that, should the city have forbade demolition of the site's historic buildings, a feasible alternative would have been to remodel them into a restaurant and residence. The experts testified that either use would have provided a predictable rental income which would have represented the property's chief source of value. Finally, using actual treasury bill rates for the relevant years, one expert testified what Pugh's reinvestment income would have been.

The trial court correctly noted that fair market value is not the proper measure of damages in the case of a temporary taking and therefore did not err in refusing the state's instruction on comparable sales. Accordingly, we conclude that the experts' testimony was admissible and reject the state's assertion that the testimony was impermissibly speculative.

## C. "Prejudgment Interest"

The jury was instructed that, if supported by the greater weight of the credible evidence, its verdict could reflect the reasonable current value of a past sum of money reasonably invested. The state argues that the trial court erred in submitting to the jury the issue of prejudgment interest because there was no issue of fact for the jury to decide. It contends that the matter is a question of law governed by sec. 32.10, Stats., and that Pugh's damages were not liquidated. We disagree.

Assuming that a portion of the undifferentiated award did reflect lost reinvestment opportunities, "prejudgment interest" is nonetheless a misnomer. It mis-

characterizes what we conclude is actually a portion of "just compensation." "Just compensation is for property presently taken and necessarily means the property's present value, presently paid—not its present value to be paid at some future time without interest." *Grant v. Cronin,* 12 Wis. 2d 352, 355, 107 N.W.2d 153, 155 (1961). In other words, "interest" in this setting is actually a portion of the compensation to which Pugh is constitutionally entitled. This has long been the law in Wisconsin. *See Appleton Water Works Co. v. Railroad Comm'n,* 154 Wis. 121, 131, 142 N.W. 476, 478-79 (1913).

In addition, we repeat that this is a takings case arising under Wis. Const. art. I, sec. 13. It is not a condemnation proceeding, inverse or otherwise. Section 32.10, Stats., does not apply to temporary takings. *Zinn,* 112 Wis. 2d at 433, 334 N.W.2d at 75.

### D. Allocation of Damages

The state next challenges the allocation of damages between the state and the county. Of the total $180,000 award, 75% ($135,000) was allocated against the state and 25% ($45,000) was allocated against the county. The state claims it was denied due process because the jury was given no instruction as to how to apportion the damages.

The state did not request an instruction on allocation. On the contrary, it submitted a proposed special verdict which asked the jury to first determine Pugh's total damages and then to assign to the state and the county a percentage, the sum of which would total 100%. Since the given instructions adequately covered the law,

we see no reversible error. *See Hein v. Torgeson,* 58 Wis. 2d 9, 18, 205 N.W.2d 408, 413 (1973).

In addition, there was testimony detailing the county's safety patrol activities carried out pursuant to its lease from the state. One of the state's own witnesses testified that the ordinance establishing the water patrol provided that capital and operational costs were to be paid on a 75% state/25% county basis. The evidence was sufficient to support the jury verdict.

## III. NEW TRIAL IN THE INTEREST OF JUSTICE

The state advances a vague due process argument, asserting that the matter should be remanded for entry of judgment in its favor, or that we should order a new trial in the interest of justice. This assertion is undeveloped and appears without citation to legal authority. We need not address it. *In re Estate of Balkus,* 128 Wis. 2d 246, 255 n.5, 381 N.W.2d 593, 598 (Ct. App. 1985).

## IV. ATTORNEYS' FEES

The next issue is whether the trial court erred in awarding Pugh attorneys' fees for the litigation involving the temporary taking.[3] The state contends that such an award in a just compensation case is improper because it is not authorized by either statute or by the state constitution. We reluctantly agree.

Just compensation following a taking is a constitutional necessity rather than a legislative dole. *See Zinn,* 112 Wis. 2d at 436, 334 N.W.2d at 76. But the constitu-

---

[3]The trial court denied Pugh's request for attorneys' fees for the quiet title litigation. That denial is not challenged on appeal.

tional requirement of just compensation does not necessarily include payment by the state of Pugh's attorneys' fees. *See Wieczorek v. City of Franklin,* 82 Wis. 2d 19, 23, 260 N.W.2d 650, 651 (1978); *see also Dohany v. Rogers,* 281 U.S. 362, 368 (1930). In takings cases, the allowance of attorneys' fees is a matter for the legislature and not a matter of constitutional right. *Wieczorek,* 82 Wis. 2d at 23, 260 N.W.2d at 651.

Unless expressly authorized by statute, attorneys' fees are not taxable against the state. *Martineau v. State Conservation Comm'n,* 54 Wis. 2d 76, 79, 194 N.W.2d 664, 666 (1972). While sec. 32.28(3)(b), Stats., allows reasonable attorneys' fees where "[t]he court determines that the condemnor does not have the right to condemn . . . the property . . . or there is no necessity for its taking," this case did not arise under ch. 32, Stats.

The "make-whole" rationale underlying the award of incidental damages as part of just compensation in *Luber,* 47 Wis. 2d at 271, 177 N.W.2d at 380, is attractive. "A person who is put to expense through no desire or fault of his own can only be made whole when his reasonable expenses are included in the compensation." *Luber,* 47 Wis. 2d at 282, 177 N.W.2d at 386. *Luber* did not address attorneys' fees, however, leaving us bound by the above-cited precedent. Any other result would violate the rule against taxation of costs against the state in the absence of a statute expressly allowing such taxation. *Martineau,* 54 Wis. 2d at 85, 194 N.W.2d at 669.

Having determined that attorneys' fees were awarded erroneously, review of their reasonableness is unnecessary.

## V. APPELLATE FEES AND DOUBLE COSTS

Finally, Pugh contends that the state's errors and dilatory tactics have caused Pugh unnecessary hardship and expense in its attempts to realize the compensation to which it is constitutionally entitled. Consequently, Pugh asks that we award appellate attorneys' fees and double costs.

A condemnee who prevails on appeal may recover reasonable attorneys' fees incurred on appeal. *Narloch v. DOT,* 115 Wis. 2d 419, 440, 340 N.W.2d 542, 552-53 (1983). In *Narloch,* our supreme court said:

> [W]hen part or all of the condemnee's property has been taken . . . [i]f this determination is affirmed on appeal, and the condemnee prevails, it would be inconsistent [with the concept of just compensation] to allow the condemnee to recover only those litigation expenses incurred in circuit court proceedings, but not those incurred in an appeal.

*Id.* at 440-41, 340 N.W.2d at 553.

We used a similar rationale in a recent case addressing the propriety of appellate costs and fees where attorneys' fees were awarded at trial upon a finding of frivolousness. *Riley v. Isaacson,* 156 Wis. 2d 249, 456 N.W.2d 619 (Ct. App. 1990). There we stated:

> If the wronged party must bear its own legal costs on appeal in order to defend its award, it may end up substantially in the hole, may end up, indeed, worse off . . . .. Pyrrhic victories are the stuff of history but hardly balm for legal wounds. It would be unfortunate if aggrieved parties abandoned defense of their awards in order to hold down their own legal costs . . ..

*Id.* at 262, 456 N.W.2d at 624 (*quoting Mars Steel Corp. v. Continental Bank N.A.,* 880 F.2d 928, 939 (7th Cir. 1989)).

We conclude that the *Narloch* and *Riley* rationales apply with equal force in the case of an uncompensated taking. Accordingly, we conclude that appellate attorneys' fees are available as to the issues on which Pugh prevailed on appeal. *See Petros v. City of Watertown,* 152 Wis. 2d 692, 699–700, 449 N.W.2d 72, 75 (Ct. App. 1989). We remand the matter to the trial court for a determination of, first, whether the total attorneys' fees and disbursements incurred by Pugh on appeal are reasonable, and, second, what part of those fees pertain to the issues on which Pugh prevailed. *See id.* at 700, 449 N.W.2d at 75. The latter amount shall be allowed. *Id.*

We reject Pugh's double costs argument, however, because it is undeveloped and without citation to solid legal support. We decline to address it.

No costs to either party.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.