(88 CV 4062) W<small>ISCONSIN</small> R<small>ETIRED</small> T<small>EACHERS</small> A<small>SSOCIA-</small>
<small>TION,</small> I<small>NC.,</small> Conan S. Edwards, Donald G. McCloskey,
Margaret McCabe, Martha M. Schmidt and Mary
Grace Jeffery, Plaintiffs-Respondents-Cross-
Appellants,

W<small>ISCONSIN</small> E<small>DUCATION</small> A<small>SSOCIATION</small> C<small>OUNCIL</small> By Its
President, James Blank, Richard Collins, David
Camplin, Phillip Dowling and Michael Zemplinski,
Individuals, Intervening Plaintiffs-Respondents-
Cross-Appellants,

v.

E<small>MPLOYE</small> T<small>RUST</small> F<small>UNDS</small> B<small>OARD,</small> Paul Adamski, David J.
Anderson, Constance P. Beck, Gale Duschak, Joann
Elder, Stephen Frankel, Vincent Graham, Marvin
Grosskreutz, William F. Kienzle, Barbara A. Monroe,
James R. Klauser, Secretary of the Wisconsin Depart-
ment of Administration, Gary Gates, Secretary of the
Department of Employe Trust Funds and Charles P.
Smith, State Treasurer, Defendants-Appellants-
Cross-Respondents.

(88 CV 1070) S<small>TATE</small> E<small>NGINEERING</small> A<small>SSOCIATION,</small> By Its
Board of Directors, Bernard E. Kranz, Melvin B. Sen-
senbrenner, Robert W. Schaefer, Jerry A. Sieling,
Roger A. Bohn, James A. Andreshak, Steven Noel,
Ronald S. Hett, William E. Sheppard, Richard Feeney,
James B. Rice, Robert S. Merila, Thomas F. Dobson,

Richard M. Story, Nile A. Ostenso (who are also plaintiffs in their individual capacities), and Charles W. Newhouse and the Association of Career Executives, and its President James S. Thiel (who is also a plaintiff in his individual capacity), Plaintiffs-Respondents-Cross-Appellants,

WISCONSIN EDUCATION ASSOCIATION COUNCIL By Its President James Blank, Richard Collins, David Camplin, Philip Dowling and Michael Zemplinski, Individuals, Intervening Plaintiffs-Respondents-Cross-Appellants,

v.

EMPLOYE TRUST FUNDS BOARD, Paul Adamski, David J. Anderson, Constance P. Beck, Gale Duschak, Joann Elder, Stephen Frankel, Vincent Graham, Marvin Grosskreutz, William F. Kienzle, Barbara A. Monroe, James J. Murphy, Donald Smart, Mark Stone, Kenneth Stelzig, Curtis Thomas, Marilyn Wigdahl, the Department of Employe Trust Funds and its Secretary, Gary I. Gates, Defendants-Appellants-Cross-Respondents,

James R. KLAUSER, Secretary of the Wisconsin Department of Administration, and Charles P. Smith, State Treasurer, Defendants-Co-Appellants-Cross-Respondents.†

Court of Appeals

*No. 94–0712. Oral argument March 16, 1995.—Decided July 20, 1995.*

†Petition to review granted.

(Also reported in 537 N.W.2d 400.)

1006

1008

1009

1010

1011

1012

For the defendants-appellants-cross-respondents the cause was submitted on the briefs of *Thomas M. Pyper* of *Whyte, Hirschboeck & Dudek, S.C.* of Madison, and *Peter L. Gardon* of *Reinhart, Boerner, Van Deuren, Norris & Rieselbach, S.C.* of Madison. There was oral argument by *Peter L. Gardon.*

For the defendants-co-appellants-cross-respondents the cause was submitted on the briefs of *Arvid A. Sather* and *Ann Ustad Smith* of *Michael, Best & Friedrich* of Madison. There was oral argument by *Ann Ustad Smith.*

For the intervening plaintiffs-respondents-cross-appellants the cause was submitted on the briefs of *Chris Galinat, Bruce Meredith* and *Anthony L. Sheehan* for Wisconsin Education Association Council. There was oral argument by *Bruce Meredith.*

For the plaintiffs-respondents-cross-appellants, Wisconsin Retired Teachers Association, Inc., the cause was submitted on the briefs of *John W. Calhoun, John H. Bowers* and *Kent I. Carnell* of *Lawton & Cates* of Madison. There was oral argument by *John W. Calhoun.*

For the plaintiffs-respondents-cross-appellants, State Engineering Association, the cause was submitted on the briefs of *William Haus* and *Michael E. Banks* of *Kelly and Haus* of Madison. There was oral argument by *William Haus.*

Amicus Curiae brief was filed by *Betsy J. Abramson* of Coalition of Wisconsin Aging Groups - Elder Law Center, and *Mary Ellen Signorille* of American Association of Retired Persons.

Before Eich, C.J., Gartzke, P.J., and Vergeront, J.

VERGERONT, J. This class action challenges the constitutionality of legislation[1] concerning the Wisconsin Retirement System (WRS), the retirement system for public employees. Under the legislation, earnings on the WRS trust fund assets of certain annuitants are used to pay supplemental benefits that are not a commitment of the WRS trust fund. Only annuitants who retired prior to October 1, 1974, receive the supplemental benefits. The purpose of the legislation is to reduce the general purpose revenue (GPR) funding of supplemental benefits. We conclude the legislation and its implementation unconstitutionally take the property of the plaintiff class of WRS annuitants for a public purpose without just compensation. The WRS trust fund annuity reserve account must be reimbursed by the amount distributed that replaced GPR expenditures for supplemental benefits, plus an amount equal to the average rate of earnings of the investment trust fund assets since the date of the first distribution. We also conclude that the attorneys for the class are entitled to payment of attorney fees from the amount paid back to the annuity reserve account.

The State Engineering Association (SEA) and the Wisconsin Retired Teachers Association (WRTA) initiated this action. The Wisconsin Education Association Council (WEAC) intervened as a plaintiff.[2] The defend-

---

[1] 1987 Wis. Act 27, §§ 436m, 684r and 688km. This legislation is referred to as the special investment performance dividend (SIPD) legislation. The text of the legislation and other pertinent statutes cited in this opinion are contained in the Appendix.

[2] Originally, SEA and WRTA each brought a separate action. The two actions were consolidated and WEAC's motion to intervene was granted.

1014

ants are the members of the Employe Trust Funds Board (trustees); Gary Gates, the Secretary of the Department of Employe Trust Funds; James Klauser, the Secretary of the Department of Administration; and Charles Smith, the State Treasurer.[3]

The trial court held that the legislation violates constitutional prohibitions against the taking of property without just compensation,[4] increasing benefits without providing state funds,[5] and impairment of contracts.[6] It concluded that neither sovereign immunity nor the separation of powers doctrine bars monetary relief under the first two of these constitutional provisions, and ordered payments to certain class members. The trial court also decided that Gates and the trustees

---

[3] We refer in this opinion to the Employe Trust Funds Board members and Gary Gates as the fiduciary defendants, and to James Klauser and Charles Smith as the administration defendants.

[4] WIS. CONST. art. I, § 13 provides:

The property of no person shall be taken for public use without just compensation therefor.

[5] WIS. CONST. art. IV, § 26 provides in part:

(1) The legislature may not grant any extra compensation to a public officer, agent, servant or contractor after the services have been rendered or the contract has been entered into.

. . . .

(3) Subsection (1) shall not apply to increased benefits for persons who have been or shall be granted benefits of any kind under a retirement system when such increased benefits are provided by a legislative act passed on a call of ayes and noes by a three-fourths vote of all the members elected to both houses of the legislature and such act provides for sufficient state funds to cover the costs of the increased benefits.

[6] WIS. CONST. art. I, § 12 provides:

No bill of attainder, ex post facto law, nor any law impairing the obligation of contracts, shall ever be passed, and no conviction shall work corruption of blood or forfeiture of estate.

had breached their fiduciary duties but were shielded from personal liability under the doctrine of official immunity. The trial court ordered payment of plaintiffs' attorney fees.

Defendants appeal, claiming that the legislation is constitutional; that sovereign immunity bars all monetary relief; that Gates and the trustees did not breach their fiduciary duties; and that attorney fees should not have been awarded. On cross-appeal, plaintiffs contend that the constitutional prohibition against the impairment of contracts is self-executing; that the trial court's remedy does not make them whole; and that Gates and the trustees are not entitled to official immunity.

In addition to our conclusions regarding an unconstitutional taking and attorney fees, we also hold: (1) the prohibition in the Wisconsin Constitution against increasing benefits without providing state funds does not entitle any class member to prospective monetary relief; (2) sovereign immunity bars monetary relief from defendants in their official capacities for impairment of contract; (3) Gates and the trustees did not breach their fiduciary duties; and (4) Gates and the trustees are not personally liable.

## BACKGROUND

*Wisconsin Retirement System*

The WRS provides benefits to public employees as set forth in ch. 40, STATS. The Department of Employe Trust Funds (DETF) is the state agency created to administer the WRS under the direction and supervision of the Employe Trust Funds Board (board). Section 15.16, STATS. Section 40.01, STATS., creates a public employee trust fund "solely for the purpose of

ensuring the fulfillment at the lowest possible cost of the benefit commitments to participants, as set forth in this chapter, and shall not be used for any other purpose." Section 40.01(2). The source of the WRS trust fund's assets are the statutorily-required contributions of the participating employees and employers and the investment earnings on those contributions.

Within the trust fund there is a fixed retirement investment trust[7] that contains three reserve accounts relevant to this case. Employee contributions are credited to the employee accumulation reserve account and employer contributions are credited to the employer accumulation reserve account. Section 40.04(4) and (5), STATS. The third reserve account is the annuity reserve account. Section 40.04(6). When a participating employee retires, funds are transferred from the first two accounts into the annuity reserve account in an amount equal to the present value of the annuity.[8] In addition to these three reserve accounts, ch. 40, STATS., provides for a "transaction amortization account" (TAA). Section 40.04(3). The TAA is an accounting mechanism. It smooths out the effects of gains and losses arising in all three reserve accounts due to financial market fluctuations. The amount and timing of allocations from the TAA to the three reserve accounts is specified by statute. Section 40.04(3).

---

[7] Chapter 40, STATS., also provides for a variable retirement investment trust, but this action involves only the fixed retirement investment trust.

[8] The annuity reserve account is increased by investment earnings at the "effective rate," which is defined by § 40.02(23), STATS., and is reduced by the aggregate amount of annuity payments and death benefits paid and by the present value at the date of termination of annuities terminated according to statute. Section 40.04(6), STATS.

In addition to monthly annuities,[9] annuitants receive increased benefits in the form of dividends distributed from the surplus in the annuity reserve account. The primary source of this surplus is investment earnings exceeding the "assumed benefit rate," currently five percent. Section 40.02(6), STATS. Section 40.27(2), STATS., requires that this surplus be distributed "if the distribution will result in at least a 2% increase in the amount of annuities in force, on recommendation of the actuary."[10] Since 1984, the board's policy has been to distribute dividends under § 40.27(2) as an equal percentage of increase in the amount of all annuities in force, except that dividends for annuities in force for less than one year are pro-rated for that year. WIS. ADM. CODE § ETF 20.25(1). The dividend is added to a recipient's fixed annuity and becomes part of the annuity for purposes of determining subsequent percentage increases.[11]

*Supplemental Benefits*

Legislation in 1974 significantly increased fixed annuities for those retiring on or after October 1, 1974,

---

[9] Most monthly annuities are calculated using a formula, but some retirees receive annuity benefits based on the amount of money credited to the individual's WRS account at the time of retirement plus matching contributions from the employer reserve account.

[10] *See* Appendix for the text of § 40.27(2), STATS.

[11] A distinction remains between the original fixed annuity and the increase due to dividend distributions under § 40.27(2), STATS. The former are guaranteed while the latter may be revoked as to future payments if a deficit occurs in the fixed annuity reserve. Section 40.27(2)(c).

but not for those retiring before that date.[12] To help bridge the gap between annuitants who benefited from this legislation and those who did not, the state began to provide supplemental benefits to pre-1974 annuitants. The supplemental benefits were funded from GPR and were not benefit commitments of the trust fund under ch. 40, STATS. Between 1974 and 1987, approximately eight bills were enacted by the legislature to provide supplemental benefits. The amount of supplemental benefits provided to a particular recipient was not based on an actuarial formula and the criteria varied with each legislative act.

*The SIPD Legislation*

1987 Wis. Act 27 created § 40.04(3)(e), STATS., which provides that as of September 30, 1987, $230 million is to be distributed from the TAA to the three reserve accounts of the trust fund.[13] From the portion of that sum credited to the annuity reserve account, "[n]otwithstanding s. 40.27(2), the board shall make the distribution as a special investment performance dividend [SIPD] to provide an annuity increase only to those persons currently receiving a supplemental benefit . . . ." Section 40.04(3)(e)1a. The portion credited to the annuity reserve account was to be distributed as soon as possible after August 1, 1987, but with an effective date of July 1, 1987.

---

[12] We refer to those retiring before October 1, 1974, as "pre-1974 annuitants."

[13] Since the TAA is an accounting mechanism, not an account, "distribution" from the TAA to the reserve accounts under this legislation was actually an acceleration of the realization of the gains on earnings of the reserve accounts.

1987 Wis. Act 27 also amended § 20.515(1)(a), STATS., which had appropriated sums sufficient for supplemental benefits. As amended, § 20.515(1)(a) provides that those appropriations shall be reduced by the amount of the SIPD; until the SIPD is implemented, supplemental benefits are to continue to be funded from GPR, but DETF is to reimburse the state for those sums expended from GPR funds for supplemental benefits that are directed to be reduced as a result of the receipt of the SIPD. Finally, 1987 Wis. Act 27 deleted § 40.27(1) and (1m), STATS., which provided for supplemental benefits.

Of the $230 million transferred under the SIPD legislation, $78,556,048 was transferred to the annuity reserve account. This was the projected amount needed to replace GPR funding of supplemental benefits. At the time of the transfer, on September 10, 1987, the annuity reserve account had approximately $6.1 million in surplus. The transfer increased the surplus to an approximate total of $84.7 million, and this total, on the instructions of DETF Secretary Gates, was designated for the SIPD.

*Implementation of SIPD*

On August 3, 1987, Gates asked the board's actuary to devise a formula to distribute the SIPD that would displace the maximum amount of supplemental benefits and most effectively blunt the impact of inflation on benefits of the oldest annuitants. The board adopted the formula developed by the actuary at its September 29, 1987 meeting. The board also delegated to Gates, upon recommendation of the board actuary and subject to approval of the board chair, authority to modify the formula, if necessary, to comply with the

attorney general's opinion on the constitutionality of the SIPD legislation.

On July 20, 1987, Gates requested an attorney general's opinion on this question: whether redirecting investment earnings from assets in the annuity reserve to fund supplemental benefits payable only to pre-1974 retirees violates the contractual rights of those who retired after that date.[14] On December 8, 1987, the attorney general issued an opinion in response to Gates's request, concluding that the SIPD legislation did not cause a constitutional infringement of the contractual rights of WRS annuitants retiring after 1974.

The SIPD was first implemented in December 1987. The amount of $3,806,645.85 was transferred from the annuity reserve account to reimburse the GPR appropriation for the supplemental benefits paid from GPR for the months of July 1987 through November 1987, as required by § 40.04(3)(e)1, STATS. GPR expenditures for supplemental benefits were $5,214,072 from January through June, 1987; $440,705 from July through December, 1987 (taking the reimbursement into account).

As of July 1, 1987, there were approximately 76,763 WRS annuitants, 20,394 of whom were receiving supplemental benefits and, therefore, were eligible

---

[14] Gates also presented a second question in the request: whether paying increases formerly funded by GPR from the earnings of the trust fund violated article IV, section 26 of the Wisconsin Constitution. But he deleted this question in follow-up correspondence to the attorney general. On September 2, 1987, in an opinion requested by Tom Loftus, Chairperson of the Assembly Organization Committee, the attorney general concluded that the SIPD legislation did not violate article IV, section 26 of the Wisconsin Constitution. *See* 76 Op. Att'y Gen. 224 (1987).

for the SIPD. Of those eligible, 17,430 received a distribution from the SIPD that was larger than the supplemental benefits they had been receiving from GPR. Approximately 2,964 of those eligible for the SIPD received distributions that were less than the amount of supplemental benefits they had been receiving. This group continues to receive supplemental benefits from GPR in amounts equal to the difference between the supplemental benefits they had been receiving prior to the SIPD legislation and their SIPD distributions. The highest percentage increase received as SIPD was 134.6% and the lowest percentage increase was 13%. If the SIPD had been distributed to all annuitants, instead of just pre-1974 annuitants, the result would have been an annuity increase of between 2.4% and 2.6% for each annuitant.

*Trial Court Proceedings*

The trial court held a two-day bench trial. In addition to testimony, the parties submitted an extensive stipulation of facts. The trial court declared that the implementation of the SIPD violated article IV, section 26 of the Wisconsin Constitution (the "extra compensation clause") because it granted increased benefits to retired public employees without state funds. The court also declared that the implementation of the SIPD violated statutory and state and federal constitutional provisions prohibiting the impairment of contracts; that defendants breached their contract with plaintiffs; and that the trustees breached their duty of impartiality owed to plaintiffs.

On plaintiffs' motion, the trial court designated the action as a class action and ordered notification to

the class.[15] The trial court then rendered its decision on remedies. The court concluded that an unconstitutional taking of plaintiffs' property had occurred. It concluded that Gates was a fiduciary of the trust fund and had breached his fiduciary duty in the same manner as had the trustees. However, it concluded that Gates and the trustees were not personally liable for money damages under the doctrine of official immunity. The claims against the fiduciary defendants in their official capacities were claims against the State, the court held, and sovereign immunity was waived for the violations of the extra compensation clause and the takings clause, but not the impairment of contracts clause. The court ordered defendants, in their official capacities, to pay a lump sum to class members who had received no portion of the SIPD, and to pay these annuitants a permanent annuity increase in their monthly benefits.[16] The SIPD was to remain in place.

---

[15] The class consisted of three subclasses: (a) annuitants who began receiving an annuity on or between October 1, 1974 and December 31, 1987, and whose annuities were in effect on May 1, 1988, or the beneficiary receiving a continuation of such an annuity; (b) annuitants receiving an annuity as of September 1974, and whose supplemental benefits were replaced entirely by the SIPD; and (c) annuitants receiving an annuity as of September 1974, and who, after July 1, 1987, continued to receive supplemental benefits.

[16] The lump sum represented an annuity increase of two percent effective July 1, 1987, plus five percent investment earnings compounded annually from that date to the date of the lump sum payment. The permanent annuity increase was equal to two percent of the monthly annuity the annuitants were receiving on July 1, 1987, plus increases supported by annual earnings at the rate of five percent from July 1, 1987, to the date of their regular August 1994 payments.

The trial court also ordered the fiduciary defendants in their official capacities to pay plaintiffs' attorney fees because defendants' breach of fiduciary duties rose to the level of mismanagement under § 814.14, STATS. The trial court stayed the portion of its order concerning monetary relief pending this appeal.[17]

Because the material facts are not disputed, this appeal presents questions of law that we decide de novo, without deference to the trial court's determinations. *Tahtinen v. MSI Ins. Co.*, 122 Wis. 2d 158, 166, 361 N.W.2d 673, 677 (1985). Nonetheless, we value the opinion of the trial court, particularly where, as here, the court has provided a thorough and well-reasoned decision. *See Scheunemann v. City of West Bend*, 179 Wis. 2d 469, 475-76, 507 N.W.2d 163, 165 (Ct. App. 1993).

## UNCONSTITUTIONAL TAKING

The first issue we address is whether the SIPD legislation and its implementation unconstitutionally take property. We conclude that the SIPD legislation is a taking for public use without just compensation. The legislation takes the WRS annuitants' private property interest in the earnings of the trust fund and uses those earnings for a purpose not authorized by the trust—to pay for supplemental benefits to pre-1974 annuitants.

The initial question is whether a property interest exists for purposes of the takings clause. This is a question of state law. *See Ruckelshaus v. Monsanto Co.*, 467

---

[17] A petition to bypass the court of appeals was denied by the supreme court by order dated November 16, 1994.

U.S. 986, 1001 (1984) (property interests are not created by the Constitution but are created and defined by an independent source such as state law).

In *State Teachers' Retirement Bd. v. Giessel*, 12 Wis. 2d 5, 106 N.W.2d 301 (1960), our supreme court considered a challenge to legislation that required the state teachers' retirement fund to reimburse GPR from the earnings of the retirement fund for certain costs of a study on policy issues relating to the retirement system. The retirement system then included three separate funds, one being the teachers' retirement fund. The study encompassed all three funds. It was not disputed, and the court confirmed, that teachers have a contractual relationship with the state and a vested right in the retirement system. *Id.* at 9, 106 N.W.2d at 304-05. A disputed issue was whether that right included earnings on contributions to the teachers' retirement fund prior to the allocation of those earnings to an individual teacher's account. The court held that it did:

> The teacher's right, based on contract, extends to the retirement system. The earnings on investments, part of which represent contributions made by the teachers and part contributed by the state under the contract with them, constitute assets of the system. . . .
>
> The appellant's argument would deny any rights to the earnings on the investment until they are allocated and credited to the individual teacher's account. The right cannot be construed so narrowly. The right includes the proper use of the earnings. . . . [T]he legislature and the plaintiff board are not free to spend or appropriate the earnings of the fund except in a manner authorized by

1025

statute relating to the state teachers' retirement system.

*Id.* at 10, 106 N.W.2d at 305.

After concluding that the study was not authorized by the statute governing the teachers' retirement fund, the court declared invalid that portion of the challenged law that required reimbursement for the costs of the study from the earnings of the fund.

We are aware of a possible inconsistency between *Giessel* and *Ass'n of State Prosecutors v. Milwaukee County*, 189 Wis. 2d 291, 525 N.W.2d 768 (Ct. App. 1994), *petition for review granted*, 191 Wis. 2d vii, 531 N.W.2d 325 (1995). In *Ass'n of State Prosecutors*, this court held that transferring employer contributions made on behalf of participating, non-vested district attorneys from the Milwaukee County Employee Retirement System to the WRS was not an unconstitutional taking of the property of vested employees. A statute permitted Milwaukee County assistant district attorneys to elect to transfer these contributions, plus accrued interest, so that they would receive service credit for county employment occurring before they became participants in the WRS. Milwaukee County objected to the transfer of funds. We concluded that the vested assistant district attorneys did not have a property interest in the funds sought to be transferred. *Id.* at 312, 525 N.W.2d at 777. We did not discuss *Giessel* in reaching this conclusion.

Because the teachers' retirement fund was merged with other state employee retirement systems into the WRS, we consider that *Giessel* controls on the issue of whether WRS annuitants have a property interest in the earnings of the trust fund. If *Ass'n of State Prosecutors* is inconsistent with *Giessel*, we must follow *Giessel*. *See State v. Olsen*, 99 Wis. 2d 572, 583, 299

N.W.2d 632, 638 (Ct. App. 1980) (court of appeals is bound by prior decisions of the Wisconsin Supreme Court).

We conclude on the basis of *Giessel* that WRS annuitants have a property interest in the earnings of the trust fund, in particular the earnings of the annuity reserve account. The annuitants belonging to the certified class therefore have a property interest in the $84.7 million in the annuity reserve account that was designated for the SIPD.

The next question is whether the property of the annuitants in the certified class was taken for a public purpose. Although the challenge to the legislation in *Giessel* was not framed as a takings clause violation, *Giessel* tells us that the annuitants' interest in the trust fund includes the right to have the earnings of the trust fund used only for purposes authorized by the statute establishing the fund. Use by the state for other purposes is unauthorized and would, if the unauthorized purpose is a public one, be a taking within the meaning of article I, section 13 of the Wisconsin Constitution.

It is evident from the language of the SIPD legislation that its purpose is to shift the source of funding of supplemental benefits from GPR to the earnings of the trust fund. None of the defendants disputes this. It is also undisputed that supplemental benefits are not commitments of the trust fund. The method prescribed in the SIPD legislation to accomplish the shift is direct reimbursement from the annuity reserve account to GPR for supplemental benefits paid after the effective date of the legislation and until implementation of the SIPD, and thereafter reduction of supplemental bene-

1027

fits by the amount of SIPD distributed. The latter method is an indirect way of shifting the cost of supplemental benefits from GPR to annuity reserve account earnings, but the result is the same as that accomplished by the initial direct reimbursement: earnings on the annuity reserve account are used to pay for supplemental benefits, thereby reducing GPR expenditures for those benefits. This is not significantly different from the legislatively mandated reimbursement declared invalid in *Giessel*. Here, as in *Giessel*, legislation mandated the expenditure of retirement fund earnings for a purpose not authorized by the statute governing the fund.

The administration defendants do not dispute that WRS annuitants have a property interest in the earnings of the trust fund in general, and the annuity reserve account in particular. But they argue that the distributions by the board under the SIPD legislation were consistent with and authorized by § 40.27(2), STATS., and therefore no taking of the annuitants' property occurred. They point to the fact that the legislation as passed did not require that the SIPD be equal to the amount of supplemental benefits an annuitant was receiving. Such a requirement was vetoed by the governor at the request of Gates.[18]

The result of the veto is that the board did have some discretion in the amount of the SIPD to distribute to pre-1974 annuitants. The board used its discretion to develop a formula that varied by effective date and

[18] The following was deleted from § 40.04(3)(e)1a, STATS., by veto of the governor:

> a. . . . The special investment performance dividend under this subdivision shall be equal to the supplemental annuity that an annuitant currently receives pursuant to ss. 40.02(17)(d), 1985 stats., and 40.27(1) and (1m), 1985 stats.

was aimed at offsetting the negative effects of inflation, as well as at displacing the maximum amount of supplemental benefits. But the board had no discretion to distribute any of the SIPD to post-1974 annuitants. The purpose of the legislation was to shift the cost of supplemental benefits for pre-1974 annuitants to the trust fund, and only pre-1974 annuitants received supplemental benefits. To the extent permitted by the SIPD legislation, Gates and the board tried to conform the SIPD distributions to the requirements of § 40.27(2), STATS. But that does not alter the fact that the purpose and effect of the legislation was to use trust fund earnings to pay for supplemental benefits.

The governor's veto message does not indicate otherwise. The message stated in relevant part:

> I have vetoed a provision which specifies that the special performance dividend provided by this section be "equal to" the current GPR supplement. The actuarial consultant to the Wisconsin Retirement System will determine the precise amount which can be paid by the transfer from the transaction amortization account. The supplemental appropriation under section 20.515(1)(a) of the statutes remains to assure that annuitants affected by this section are held harmless.

Governor Tommy Thompson, Veto Message at 9 (July 31, 1987), 1987 Wis. Act 27. The veto message shows that a change has been made in how the precise amount of the SIPD distributions is determined. But it does not suggest any change in the central purpose of the legislation—to reduce GPR expenditures for supplemental benefits by shifting the cost of maintaining those benefits to the earnings of the trust fund.

■ The administration defendants also argue that the SIPD benefited certain WRS annuitants by replacing their supplemental benefits with dividends that increased their annuities. Unlike supplemental benefits, the increased annuities cannot be revoked except under limited circumstances. *See* § 40.27(2)(c), STATS. But the fact that only WRS annuitants received SIPD, and that those who did benefited from that receipt, does not make payment of supplemental benefits an authorized use of trust fund earnings. The court in *Giessel* rejected the argument that because teachers benefited from the study conducted on the retirement system, the cost of the study was a permissible use of earnings on their retirement fund. *Giessel*, 12 Wis. 2d at 11-12, 106 N.W.2d at 305-06.

## REMEDY FOR THE UNCONSTITUTIONAL TAKING

*Sovereign Immunity*

■ Once property is taken in the constitutional sense, just compensation is constitutionally required. *Zinn v. State*, 112 Wis. 2d 417, 431, 334 N.W.2d 67, 74 (1983). The administration defendants argue that sovereign immunity bars any monetary recovery that would come from the state treasury; but they do not discuss this issue with respect to the takings claim in particular. Sovereign immunity derives from article IV, section 27 of the Wisconsin Constitution, which provides that "[t]he legislature shall direct by law in what manner and in what courts suits may be brought against the state."

But sovereign immunity does not bar an action for just compensation based on the taking of private property for public use, even though the legislature has failed to establish specific provisions for the recovery of just compensation. *Zinn*, 112 Wis. 2d at 435, 334 N.W.2d at 75-76. The takings clause is self-executing and needs no express statutory provision for its enforcement because just compensation following a taking is a constitutional necessity; the "waiver" of sovereign immunity is found in the constitutional provision itself. *Id.* at 436, 334 N.W.2d at 76.

## Notice of Claim

The administration defendants also argue that no remedy other than injunctive or declaratory relief is available because plaintiffs did not comply with § 893.82(3), STATS., the notice of claim statute applicable to claims against state officers, employees or agents. Defendants recognize that the notice of claim requirement in § 893.82(3) does not apply to equitable actions against state officials, *Casteel v. McCaughtry*, 176 Wis. 2d 571, 585, 500 N.W.2d 277, 283-84, *cert. denied*, 114 S. Ct. 327 (1993), and *Lewis v. Sullivan*, 188 Wis. 2d 157, 169, 524 N.W.2d 630, 634 (1994), or when monetary relief is ancillary to the essentially equitable nature of the action, *Flood v. Board of Educ.*, 69 Wis. 2d 184, 188, 230 N.W.2d 711, 714 (1975). But, according to defendants, the essential nature of this action is one for monetary damages. Again, they do not

1031

discuss these points in the particular context of the takings claim.[19]

We conclude the notice of claim statute does not apply to a claim of unconstitutional taking. Such a claim is not a claim for money damages. Just compensation for an unconstitutional taking is in the nature of an equitable remedy. An action seeking a declaration that an unconstitutional taking has occurred and asking for just compensation is an equitable action.

*Just Compensation*

In order to determine the just compensation to which plaintiffs are entitled, we must first define more precisely what was taken. The trial court and the parties on appeal have focused on what each annuitant would have, or should have, received in distributions had the $84.7 million not been designated for the SIPD. We conclude the taking was the use of the trust fund earnings in the annuity reserve account to pay for supplemental benefits. Therefore, as a starting point, the amount taken is that portion of the distributed SIPD that reduced GPR expenditures for supplemental benefits.

We cannot determine this amount from the record, but we assume it can be calculated from existing or obtainable data. The amount taken is not necessarily

---

[19] The administration defendants also assert in a footnote that any monetary recovery must be limited by § 893.82(6), STATS., which provides that the "amount recoverable by any person or entity for any damages, injuries or death . . . shall not exceed $250,000." There is no other discussion of this point. We do not consider undeveloped arguments. *See State v. Gulrud*, 140 Wis. 2d 721, 730, 412 N.W.2d 139, 142-43 (Ct. App. 1987).

the $84.7 million designated for SIPD because, as we understand the record, not all of that has been distributed.[20] Nor is the amount taken equal to the SIPD already distributed because not all distributed SIPD served to replace supplemental benefits. The SIPD distributed to some annuitants exceeded the supplemental benefits they were receiving, and that excess did not reduce GPR expenditures for supplemental benefits.

We say "starting point" when we describe the property taken because the class also lost the amount the trust fund would have earned on that property. Just as interest is part of constitutionally required just compensation, so, in this case, are the lost earnings on the property taken. *See W.H. Pugh Coal Co. v. State*, 157 Wis. 2d 620, 633, 460 N.W.2d 787, 792 (Ct. App. 1990). We conclude the amount of lost earnings is the average rate of earnings of the trust fund assets from the date of the first distribution of the SIPD to the date the amount taken is returned to the trust fund.

The trial court considered that it was within its equitable powers to order what it termed a "minimalist remedy," taking into account the impact on the state treasury and taxpayers and the fact that certain annuitants benefited from the SIPD.[21] We conclude that a court may not for those reasons order less than just

[20] The record shows that as of October 30, 1992, there was an estimated $36 million remaining from the $84.7 million.

[21] As we stated above, the fact that certain annuitants received the SIPD distribution does not mean that the use of the trust fund earnings was authorized. And those annuitants certainly had no role in determining how those earnings were distributed.

compensation. Equitable relief, in the form of an injunction against a continuing unconstitutional taking, is appropriate when compensation is not available or is inadequate relief. *See Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1522-23 (D.C. Cir. 1984), *judgment vacated on other grounds*, 471 U.S. 1113 (1985). But we know of no authority for using equity to reduce an award of just compensation once the court has found that an unconstitutional taking has occurred and can determine the amount taken. *See First English Evangelical Lutheran Church v. County of Los Angeles*, 482 U.S. 304, 322 (1987) (invalidation of an ordinance without payment of fair value of the property temporarily taken would be a constitutionally insufficient remedy).

Because the unconstitutional taking is continuing, plaintiffs are entitled to declaratory relief and an injunction against 1987 Wis. Act 27, §§ 684r and 688km, in addition to just compensation.

## EXTRA COMPENSATION CLAUSE

The trial court decided that the SIPD legislation violated article IV, section 26 of the Wisconsin Constitution because the legislation granted "increased benefits" to retirees but did not "provide . . . for sufficient state funds to cover the costs of the increased benefits" as required by that provision. The trial court then concluded that this provision waived sovereign immunity and that plaintiffs were entitled to prospective state funding of the SIPD.

The administration defendants argue that there is no violation of the extra compensation clause because the SIPD does not constitute "increased benefits," but rather distributions of dividends under § 40.27(2),

STATS., from funds in which annuitants already have an interest. They also argue, somewhat inconsistently in our view, that the trust fund earnings used for the SIPD are "state funds." Plaintiffs respond that the SIPD constitutes "increased benefits" because it is not a dividend distributed pursuant to § 40.27(2), but is rather an annuity increase that replaces supplemental benefits; and the trust fund earnings are not "state funds." In plaintiffs' view, the constitutional provision is self-executing and requires prospective funding of the SIPD from the state treasury.

We do not decide whether the SIPD legislation violates the extra compensation clause because even if it does, plaintiffs are not entitled to the remedy they seek. They ask for an order directing the state, or defendants in their official capacities, to pay for the SIPD with state funds. We conclude they are entitled only to the cessation of the use of non-state funds to pay for the SIPD.

The extra compensation clause in its original form contained only the first sentence of the current version, flatly prohibiting the payment of any extra compensation to public employees after they retired. *See* note 5. In 1956, an exception was added for retirement benefits for teachers, thereby permitting the legislature to increase retirement benefits for teachers who had already retired. Then, in 1974, this exception was expanded to all public employees, permitting the legislature to increase retirement benefits for all retired public employees. The legislature did this in various laws, first passed in 1974, that provided for supplemental benefits. At the same time that the exception was expanded to all retired public employees, this phrase was added: "such act provides for sufficient state funds to cover the costs of the increased benefits."

1035

It is this phrase on which plaintiffs rely in arguing that they are entitled to have the SIPD paid for prospectively from state funds.

In interpreting a constitutional amendment, we are to ascertain the intent not only "by considering the words . . . but by ascertaining the general purpose of the whole, in view of the evil which existed calling forth the framing and adopting of such instrument, and the remedy sought to be applied." *Kayden Indus., Inc. v. Murphy*, 34 Wis. 2d 718, 730, 150 N.W.2d 447, 452 (1967). The purpose of the 1974 amendment to the extra compensation clause was spelled out in the Appendix to 1973 SJR 15—Report of Joint Survey Committee on Retirement Systems as follows:

> The present law allows the adjustment of a retirement pension received by a retired teacher under a teachers' retirement system within the state. However, it precludes such an adjustment being made for retired members of all other public retirement systems, excepting federal, the Milwaukee City Employees Retirement system and the Milwaukee County Employees Retirement system, located within the state.
>
> . . . .
>
> It hardly seems equitable that retired members of all teacher retirement systems within the state are granted this benefit while, at the same time, the retired members of all other public retirement systems, excluding federal, are denied them.
>
> It should be borne in mind that in the event the constitution is amended as provided in this resolution, the final decision as to whether or not a specific bill is passed to increase retirement allowances for retired persons other than teachers will rest with the legislature.

In all probability, the legislature would review such bills very closely inasmuch as the state would be required to pay for any increased costs generated as a result of the passage of such bills.

We see nothing in the language of the extra compensation clause as amended, or in the stated purpose of the amendment, to indicate that the ability of the legislature to decide whether to increase benefits was to be limited. Rather, the legislature's prerogative in that regard is affirmed in the above-cited passage. We read the new language concerning state funds to mean that the state must pay for any increased benefits.

Any use of non-state funds to increase benefits is remedied by ordering a halt to the use of those funds for that purpose. Assuming the trust fund earnings are not state funds, an injunction against continued implementation of the SIPD legislation will stop the use of those non-state funds to pay for increased benefits. This may mean that the increased benefits will cease as well if the legislature chooses not to provide state funds. But that would not be a violation of the extra compensation clause since the clause does not require the legislature to increase benefits and does not give any person the right to increased benefits.

The state's liability for prospective funding of the SIPD is distinct from whether sovereign immunity bars a remedy for that liability. *See Erickson Oil Prods., Inc. v. State*, 184 Wis. 2d 36, 50, 516 N.W.2d 755, 759-60 (Ct. App. 1994) ("Whether the State is liable on a particular contract is a different question from whether the State is immune from being sued by an aggrieved party on that contract."). Since we conclude

1037

the state has no liability for prospective funding of the SIPD under the extra compensation clause, we need not address the issue of sovereign immunity.

## BREACH OF CONTRACT/IMPAIRMENT OF CONTRACT

Plaintiffs contend that the implementation of the SIPD legislation breached their contract with the state and violated article I, section 12 of the Wisconsin Constitution, which prohibits legislation that impairs the obligation of contracts. They argue that sovereign immunity does not bar their recovery of contract damages from the state. We do not address the merits of these claims because we conclude that sovereign immunity bars the recovery of monetary damages from the state for any breach or impairment of contract that has occurred, and the injunctive relief ordered as a remedy for the unconstitutional taking will prevent future breach or impairment.[22]

The legislature has the exclusive right to consent to suit against the state and consent will not be implied from legislation that is less than clear and express. *Erickson Oil Prods.*, 184 Wis. 2d at 52, 516 N.W.2d at 760. We agree with the trial court that the language of the impairment of contracts clause does not indicate any intention to permit suit against the state for breach or impairment of a contract with the state. Plaintiffs argue that the state should not be permitted to invoke sovereign immunity after entering into a contract pursuant to legislative authorization, citing

---

[22] As we discuss later, the individual defendants have immunity from personal liability for damages.

1038

*Grant Constr. Co. v. Burns*, 443 P.2d 1005 (Idaho 1968). However, we considered that case and rejected its reasoning in *Erickson Oil Prods.* We decided in *Erickson Oil Prods.* that under Wisconsin law, legislative authorization for a state agency to enter into a contract does not constitute legislative consent to suit. *Erickson Oil Prods.*, 184 Wis. 2d at 53, 516 N.W.2d at 761.

In *Erickson Oil Prods.*, we also rejected the argument, made by WRTA, that failure to permit suit where the state has entered into a contract is an unconstitutional deprivation of a certain remedy guaranteed by article I, section 9 of the Wisconsin Constitution.[23] *Id.* at 54, 516 N.W.2d at 761. *Erickson Oil Prods.* is controlling and precludes a finding that the state has waived sovereign immunity for the claims of breach of contract or impairment of contract.

### STATUS OF SUPPLEMENTAL BENEFITS

Our ruling on the extra compensation clause and the takings clause makes it unnecessary to reach WRTA's argument that supplemental benefits for certain annuitants have become contractual obligations of the state because of the SIPD legislation. The SIPD legislation is invalid. The effect of enjoining implementation of 1987 Wis. Act 27, §§ 684r and 688km will be that supplemental benefits will again be provided with GPR funds pursuant to § 40.27(1) and (1m), STATS.,

---

[23] WIS. CONST. art. I, § 9 provides:

Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws.

1985-86.[24] Prior to the SIPD legislation, as WRTA concedes, there was no contractual entitlement to supplemental benefits. Enjoining the repeal of § 40.27(1) and (1m) and the amendment to § 20.515(1), STATS., along with enjoining implementation of § 40.04(3)(e), STATS., is part of the necessary equitable relief aimed at halting the use of trust fund earnings to pay for supplemental benefits. However, the injunction will not prevent the legislature from deciding whether to provide supplemental benefits from GPR in the future, and, if it does, in what amounts.

We recognize that the remedies we are ordering for the unconstitutional taking do not solve the problem of the pre-1974 annuitants whose annuities are less than those retiring later. The SIPD legislation attempted to solve the problem but is unconstitutional because it made unauthorized use of trust fund earnings. The courts can provide just compensation for that taking and can order that it cease, but the courts cannot order the legislature to prospectively fund benefits that it has no constitutional or statutory obligation to fund.

## BREACH OF FIDUCIARY DUTIES

The trial court decided that the trustees and Gates were fiduciaries and breached their fiduciary duties by implementing the SIPD legislation. That implementation, in the trial court's view, diverted trust fund earnings from their proper use—increasing benefits for

[24] It is our reading of § 20.515(1), STATS., that it provides a sum sufficient appropriation for supplemental benefits as provided in § 40.27(1) and (1m), STATS., 1985-86. Since there will be no offsetting payments due to distributions under § 40.04(3)(e), STATS., the supplemental benefits paid to pre-1974 annuitants from GPR funds will be as they were before passage of 1987 Wis. Act 27, §§ 684r and 688km.

all beneficial owners—and instead used them to replace GPR-funded supplemental benefits received by only a small group of annuitants. Reliance on the attorney general's opinion did not excuse this breach, according to the trial court. Citing *State ex rel. Morse v. Christianson*, 262 Wis. 262, 55 N.W.2d 20 (1952), the trial court concluded that, as trustees, they had an obligation to seek instructions from a court on the correct interpretation of instruments governing the trust. We disagree.

■

The trustees and Gates were fiduciaries and had an obligation to administer the trust for the benefit of the trust beneficiaries, in this case the WRS annuitants. But they also had an obligation to administer the trust according to the terms of the trust instrument, ch. 40, STATS. When the SIPD legislation amended ch. 40 in ways that appeared to conflict with existing provisions of ch. 40, Gates, on behalf of the board, appropriately requested an attorney general's opinion on the constitutionality of the legislation. The board did not implement the legislation until after receipt of the attorney general's opinion stating the legislation was not an unconstitutional impairment of contract.[25] Although steps were taken to implement the legislation while waiting for the opinion, the board delegated to Gates the authority to modify the formula already adopted, if necessary, to comply with the attorney general's opinion. At the time the board adopted the formula, the attorney general had already issued an opinion that the legislation did not violate the extra compensation clause.[26]

---

[25] 76 Op. Att'y Gen. 299 (1987).
[26] 76 Op. Att'y Gen. 224 (1987).

Gates and the trustees did nothing other than comply with the SIPD legislation. The correspondence and actions plaintiffs point to in support of their claim that these defendants breached their fiduciary duties demonstrate only that they were attempting to, and did comply with, the mandates of the legislation.[27] The only possible basis for finding a breach of their fiduciary duties is the fact that they carried out the legislation after receiving an attorney general opinion that it was constitutional, but without getting a court determination of constitutionality.

In *State ex rel. Morse,* the board of the Wisconsin Retirement Fund did not act on an application for annuity benefits because it was told by its legal advisor that it probably did not have the authority to pay the benefits, although the board recognized that the issue was not clear. The applicant's beneficiary sought a writ of mandamus directing the board to approve the application and a writ of certiorari commanding the board to return a transcript of its records. In commenting on the board's inaction, the court stated:

> These minutes indicate that the board recognized that the law was not entirely clear. However, the defendants were trustees administering public funds and in case of doubt as to the proper interpretation of the law it was their duty to have the law

---

[27] Plaintiffs point to the fact that Gates added the $6.1 million surplus already in the annuity reserve account to the $78.6 million transferred to that account under the SIPD legislation as evidence that he breached his fiduciary duty. Gates testified that he had no discretion to withhold surpluses in the annuity reserve account once a dividend was declared. Plaintiffs' general argument that § 40.27(2), STATS., required or permitted Gates to segregate the $6.1 million does not persuade us that Gates breached his fiduciary duty.

1042

construed by the courts before making expenditures, unless clearly legal.

*State ex rel. Morse*, 262 Wis. at 266, 55 N.W.2d at 22.

*State ex rel. Morse* does not require resort to a court where the attorney general has already rendered an opinion. In another context, our supreme court has recognized that it would be unfair to penalize public officials for relying on the advice of governmental counsel. *See State v. Davis*, 63 Wis. 2d 75, 81-82, 216 N.W.2d 31, 34 (1974) (good faith reliance on the legal opinion of governmental counsel whose statutorily-created duties include the rendering of legal opinions is a defense in a criminal action against a public official). There is no evidence that Gates and the trustees acted other than in good faith in relying on the attorney general's opinion. We conclude that they did not breach their fiduciary duties by failing to seek a court ruling before implementing the SIPD legislation.

## OFFICIAL IMMUNITY

Plaintiffs claim that the trustees and Gates are personally liable for any monetary award. They argue that official immunity, which protects public officers from personal liability for damages, does not apply because these defendants negligently performed a ministerial duty to preserve the trust funds. *See Lister v. Board of Regents*, 72 Wis. 2d 282, 300-01, 240 N.W.2d 610, 621-22 (1976) (no immunity from personal liability where an official negligently performs a ministerial duty). Plaintiffs contend that because the trustees and Gates spent funds, or did not prevent the expenditure of funds, in spite of having reasonable cause to suspect the expenditure might be improper, they lost their immunity.

We reject this argument for the same reason we held these defendants did not breach their fiduciary duties. The SIPD legislation mandated the expenditure of trust fund earnings for the SIPD. These defendants implemented that mandate after receiving an opinion from the attorney general that it was constitutional. They had no duty to refrain from implementing the legislation.

Plaintiffs also assert that the trustees are not protected by official immunity because they are not public officials. These defendants meet the criteria for being public officials holding public office. In *Burton v. State Appeal Bd.*, 38 Wis. 2d 294, 156 N.W.2d 386 (1968), our supreme court stated:

> [A public office] must be created by the constitution or through legislative act; must possess a delegation of a portion of the sovereign power of government to be exercised for the benefit of the public; must have some permanency and continuity, and not be only temporary or occasional; and its powers and duties must be derived from legislative authority and be performed independently and without the control of a superior power, other than the law, except in case of inferior officers specifically placed under the control of a superior officer or body, and be entered upon by taking an oath and giving an official bond, and be held by virtue of a commission or other written authority.

*Id.* at 300, 156 N.W.2d at 389-90.

The trustees are charged by statute with the direction and supervision of DETF, § 15.16, STATS., and are delegated extensive powers by the legislature. Section

1044

40.03(1), STATS. Each trustee must take an official oath prior to assuming office. Section 15.07(7), STATS. Gates's position as Secretary of DETF meets the requirements as well. *See* §§ 15.05(1)(b), 15.05(4), 40.03(2)(a) and 15.04, STATS.

## ATTORNEY FEES

The trial court ordered defendants in their official capacities to pay plaintiffs' attorney fees because the breach of fiduciary duties by Gates and the trustees rose to the level of mismanagement. Since we have decided that these defendants did not breach their fiduciary duties, plaintiffs are not entitled to an award of attorney fees on this basis.

The constitutional requirement of just compensation does not include attorney fees. *W.H. Pugh Coal Co.*, 157 Wis. 2d at 634-35, 460 N.W.2d at 792. It is up to the legislature to decide whether to allow attorney fees for takings claims, *id.* at 635, 460 N.W.2d at 793, and the legislature has not provided for the recovery of fees in cases of this type. Sovereign immunity therefore bars an award of attorney fees against the state that is in addition to the just compensation award.

Plaintiffs argue, in the alternative, that their attorney fees should be paid from the amount awarded as just compensation under the "common fund" doctrine. Payment of attorney fees from this source would not be barred by sovereign immunity because the administration defendants are already constitutionally obligated to pay this amount.

The common fund doctrine is an equitable doctrine that permits the payment of attorney fees of litigants who recover or protect a common fund in which others

have a beneficial interest. *In re Fesco Plastics Corp.*, 996 F.2d 152, 157 (7th Cir. 1993). "The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citation omitted).

The common fund doctrine was approved by the United States Supreme Court as "unquestionably [an] assertion . . . of inherent power in the courts to allow attorneys' fees in particular situations, unless forbidden by Congress." *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 259 (1975). It has been applied in class actions by the United States Supreme Court in *Boeing* and *Alyeska*; by the United States Court of Appeals for the Seventh Circuit in *Florin v. Nationsbank of Georgia*, 34 F.3d 560 (7th Cir. 1994), *In re Fesco Plastics Corp.*, and *Skelton v. GM Corp.*, 860 F.2d 250 (7th Cir. 1988), *cert. denied*, 493 U.S. 810 (1989); and by a federal district court in Wisconsin in *Purdy v. Security Sav. & Loan Ass'n*, 727 F. Supp. 1266 (E.D. Wis. 1989).

The common fund doctrine has not yet been considered or applied by Wisconsin courts.[28] We conclude

---

[28] In *State Farm Mut. Auto Ins. Co. v. Geline*, 48 Wis. 2d 290, 179 N.W.2d 815 (1970), the supreme court established the "fund doctrine," wherein a subrogee may be required to pay the subrogor's attorney a reasonable fee for enforcing the former's subrogation interest. *See also Oakley v. Fireman's Fund of Wisconsin*, 162 Wis. 2d 821, 833, 470 N.W.2d 882, 887 (1991). Like

that our courts have the inherent power to apply this doctrine in appropriate cases, unless forbidden by the legislature. No statute prevents us from applying the doctrine in this case. Characteristics of cases that make application of the common fund doctrine appropriate include: (1) the classes of persons benefiting are easily identifiable, (2) benefits can be traced with some accuracy, and (3) the costs of litigation can be shifted with some exactitude to those benefiting. *Boeing Co.*, 444 U.S. at 478-79.

The trial court certified a class consisting of three groups of WRS annuitants. Those persons are identifiable. They were notified of the litigation and advised that attorney fees might be deducted from any payment or increase in benefits attributable to plaintiffs' representation. The trial court appointed plaintiffs' attorneys to represent the class, finding that they had vigorously and effectively represented the interests of plaintiffs.

As a result of these attorneys' efforts, all class members will benefit by the substantial sum of money that will be ordered to be deposited in the annuity reserve account. Although the record at present does not establish that amount, it can be computed. All class members will benefit because the sum awarded will increase the amount available for dividend distributions under § 40.27(2), STATS., for all class members.

the common fund doctrine, the fund doctrine is based "on the equitable concept that an attorney who renders service in creating a trust fund may in equity be allowed compensation out of the whole fund from those who directly benefit from its accumulation." *Geline*, 48 Wis. 2d at 298, 179 N.W.2d at 819. The fund doctrine has not been applied in Wisconsin outside the insurance context.

While the amount each class member will receive from these dividend distributions cannot be determined now and will depend on future decisions made by the board, attorney fees awarded against the entire amount of just compensation "will shift the costs of litigation to each [class member] in the exact proportion that [the class member's future dividend distributions made possible by this recovery] bears to the total recovery." *Boeing Co.*, 444 U.S. at 479. We conclude that these factors make it appropriate for attorney fees to be paid out of the sum recovered.

The trustees point out that the trial court rejected as unfair the proposal that attorney fees be awarded from the amount recovered and argue that we should not disturb this determination. The trial court found the proposal unfair "because the court in balancing the equities has explicitly withheld a make-whole remedy from the plaintiffs." However, based on our decision, plaintiffs will be awarded all sums to which they are entitled: no amount is being withheld from them on equitable or other grounds. There is therefore no equitable basis on which to deny payment of attorney fees from the amount recovered. Of course, on remand the trial court becomes the fiduciary for the common fund's beneficiaries and will carefully monitor disbursement to the attorneys by scrutinizing the fee applications. *See Skelton*, 860 F.2d at 253.

## DIRECTIONS TO TRIAL COURT

For the reasons stated above, we affirm the judgment in part, reverse in part and remand to the trial court. The trial court shall enter judgment declaring that the SIPD legislation and its implementation unconstitutionally take the property interest of the class members in the earnings of the annuity reserve

account. It shall declare invalid and enjoin continued implementation of 1987 Wis. Act 27, §§ 684r and 688km. It shall order the administration defendants to pay from the state treasury to the annuity reserve account the following amount as just compensation: that portion of all SIPD distributed, beginning in 1987 (and including the $3,806,645.85 reimbursement to GPR), that reduced the GPR expenditures for supplemental benefits, plus earnings on that amount equal to the average rate of earnings of the trust fund assets from the date of the first SIPD distribution to the date of repayment to the annuity reserve account. The order shall direct that the trustees distribute this repayment to class members, exercising their discretion consistent with the requirements of ch. 40, STATS. If a class member is deceased and has beneficiaries not included in the class, the trustees are to exercise their discretion consistent with the requirements of ch. 40 as to distributions to those beneficiaries.[29]

The trial court shall also determine reasonable fees for plaintiffs' attorneys and order that this sum be paid from the amount ordered repaid to the annuity reserve account.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded with directions.

## APPENDIX

### *SIPD Legislation*

1987 Wis. Act 27, § 436m amended § 20.515(1)(a), STATS., which now provides:

---

[29] The beneficiaries of subclass A members who are receiving a continuation of annuities are included in that subclass, but beneficiaries of subclasses B and C members are not.

There is appropriated to the department of employe trust funds for the following programs:

(1) EMPLOYE BENEFIT PLANS. (a) *Annuity supplements and payments.* A sum sufficient to pay the benefits authorized under s. 40.27(1) and (1m), 1985 stats., and s. 40.02(17)(d)2. in excess of the amounts payable under other provisions of ch. 40 and any distributions made under s. 40.04(3)(e) after August 1, 1987, notwithstanding s. 40.27(2) and to reimburse any amounts expended under par. (w) for the costs of administering the benefits provided under s. 40.27(1) and (1m), 1985 stats., and s. 40.02(17)(d)2.

1987 Wis. Act 27, § 684r created § 40.04(3)(e), STATS., which provides in part:

1. As of September 30, 1987, $230,000,000 shall be distributed from the transaction amortization account of the fixed retirement investment trust to the appropriate reserve of the fixed retirement investment trust as follows:

a. The portion credited to the fixed annuity reserve shall be distributed by the board as soon as possible after August 1, 1987, but with an effective date of July 1, 1987. Notwithstanding s. 40.27(2), the board shall make the distribution as a special investment performance dividend to provide an annuity increase only to those persons currently receiving a supplemental benefit under s. 40.27(1) and (1m), 1985 stats. Any payment under s. 20.515(1)(a) to annuitants receiving special investment performance dividends under this subdivision shall be reduced by the amount of the special investment performance dividends under this subdivision.

. . . .

c. The board shall make the distribution under subd. 1. a as soon as possible after August 1,

1987. Until such time as the special investment performance dividend is effective, the supplemental annuity benefit under s. 40.27(1) and (1m), 1985 stats., shall continue to be funded from money available under s. 20.515(1)(a). After the effective date of the special investment performance dividend, the department shall provide from the portion to be credited to the fixed annuity reserve funds sufficient to reimburse the appropriation under s. 20.515(1)(a) for supplemental benefits payments made after June 30, 1987.

1987 Wis. Act 27, § 688km repealed § 40.27(1) and (1m), STATS., which had provided in part:

(1) SUPPLEMENTAL BENEFITS. Any person who received a supplemental benefit under s. 41.23, 42.49(10) or 42.82, 1979 stats., is eligible to continue receiving a supplemental benefit in the amounts determined under s. 41.23, 42.49(10) or 42.82, 1979 stats. . . .

(a) Any benefit payable by virtue of this subsection in excess of the amounts payable under other provisions of this chapter shall be paid from and shall be subject to the continuation of the appropriation made by s. 20.515(1)(a).

. . . .

(1m) ADDITIONAL SUPPLEMENTAL BENEFITS. Any person who receives an annuity for September 1974 from the Wisconsin retirement system shall be eligible to receive all of the following:

(a) The monthly annuities for which that person was eligible and which that person received for September 1974.

(b) An amount to be paid from the appropriation under s. 20.515(1)(a), subject to the continuation of that appropriation, equal to 4% times 5 years times either $200 or the initial

monthly annuity, excluding amounts provided from additional deposits, whichever is smaller.

(c) Any supplement for which that person is eligible under s. 41.23, 42.49(10) or 42.82, 1979 stats., and sub. (1).

## *Other Statutes*

Section 40.27(2), STATS., provides:

FIXED ANNUITY RESERVE SURPLUS DISTRIBUTIONS. Surpluses in the fixed annuity reserve established under s. 40.04 (6) and (7) shall be distributed by the board if the distribution will result in at least a 2% increase in the amount of annuities in force, on recommendation of the actuary, as follows:

(a) The distributions shall be expressed as percentage increases in the amount of the monthly annuity in force, including prior distributions of surpluses but not including any amount paid from funds other than the fixed annuity reserve fund, preceding the effective date of the distribution. For purposes of this subsection, annuities in force include any disability annuity suspended because the earnings limitation had been exceeded by that annuitant in that year.

(b) Different percentages may be applied to annuities with different effective dates as may be determined to be equitable but no other distinction may be made among the various types of annuities payable from the fixed annuity reserve.

(c) The distributions shall not be offset against any other benefit being received but shall be paid in full, nor shall any other benefit being received be reduced by the distributions. The annuity reserve surplus distributions authorized under· this subsection may be revoked by the board in part or in total as to future payments upon recommenda-

tion of the actuary if a deficit occurs in the fixed annuity reserves.

Section 814.14, STATS., provides in part:

> In any action or proceeding prosecuted or defended in any court in Wisconsin by an executor, administrator, guardian ad litem, trustee of an express trust, general guardian or a person expressly authorized by statute, unless otherwise specially provided, costs shall be recovered as in an action by and against a person prosecuting or defending in the person's own right; but such costs shall be chargeable only upon or collected of the estate, fund or party represented, unless the court shall direct the same to be paid by the plaintiff or defendant personally, for mismanagement or bad faith in such action, proceeding or defense.

Section 893.82(3), STATS., provides in part:

> [N]o civil action . . . may be brought against any state officer, employe or agent for or on account of any act growing out of or committed in the course of the discharge of the officer's, employe's or agent's duties . . . unless within 120 days of the event causing the injury, damage or death giving rise to the civil action . . ., the claimant in the action . . . serves upon the attorney general written notice of a claim . . . .